## In re J. C. WILSON & CO.

(District Court, S. D. New York. June 28, 1917.)

1. EQUITY ☞59—MAXIMS—EQUALITY IS EQUITY.

Equity will treat alike those similarly situated.

2. BANKRUPTCY ☞140(3)—STOCKHOLDERS—UNAUTHORIZED PLEDGE OF STOCK.

Where stockbrokers made unauthorized pledge of stock belonging to their customers, part of which pledgee, upon bankruptcy of brokers, sold to satisfy brokers' indebtedness, a customer whose stock was not sold by pledgee is no better situated than customers whose stock was sold and can be successfully traced; former being entitled merely to prorate with latter.

3. BANKRUPTCY ☞322—PLEDGED STOCK—VALUE—CLOSING OF STOCK EXCHANGE.

Where brokers made unauthorized pledge of customers' stock, and pledgee, upon brokers' bankruptcy, sold a portion of such stock to satisfy brokers' indebtedness, stock not so sold, in ascertaining amount of claim of owner thereof, will be valued as of the day upon which the first sale of similar stock was made on the Stock Exchange, where exchange had been closed because of war at time of filing of bankruptcy petition, and not opened until more than month later, during which time the stock had appreciably increased in value.

4. BANKRUPTCY ☞140(3)—STOCKBROKERS—TRACING SECURITIES.

Where broker at time of bankruptcy has stock belonging to customer, the latter, if he can trace and find his security, or securities of the same

kind, is entitled to that specific security, or its equivalent, or his pro rata share, as the case may be.

5. BANKRUPTCY ☜140(3)—STOCKBROKER—CONVERSION OF CUSTOMER'S STOCK —FOLLOWING PROCEEDS.

Where bankrupt broker has converted into money securities belonging to a customer, the latter, if he is to have a lien for amount thereof upon broker's bankruptcy, upon ground of unjust enrichment, must show that the proceeds of the conversion have gone into a particular fund, and must be able to identify those proceeds as a part of that fund.

6. BANKRUPTCY ☜140(3)—STOCKBROKERS—UNAUTHORIZED PLEDGE OF CUS-TOMER'S STOCK—SALE OF PLEDGED STOCK—INABILITY TO TRACE PROCEEDS.

Where broker made unauthorized pledge of customer's stock, which pledgee, upon broker's bankruptcy, sold to satisfy broker's debts, customer, who is unable to trace proceeds of the sale of such stock, is not entitled to lien for value of the stock, on the ground of unjust enrichment, and must be regarded as a general creditor.

7. BANKRUPTCY ☜140(3)—BROKERS—VIOLATION OF STILWELL ACT.

Penal Law N. Y. § 956, subd. 2, as added by Laws 1913, c. 500 (Stilwell Act), making conversion by broker of customer's stock or the pledging thereof without customer's consent a penal offense, cannot per se affect the equities between claimants to securities or their proceeds upon the broker's bankruptcy, though stockbroker's violation thereof, other things being equal, might place a claim in most favored class.

8. BANKRUPTCY ☜140(3)—BROKER—CONVERSION OF STOCK—PLEDGED STOCK.

Where broker converts a portion of the long stock of a customer trading on margin, and latter, with notice of conversion, allows broker to remain in possession of his unconverted stock, which is hypothecated and upon broker's bankruptcy sold by pledgee, the customer's claim, no matter how much the value of the unconverted shares exceeded his debit balance, is inferior to those of customers whose stock was hypothecated without authority, and who can trace such stock or proceeds.

9. BANKRUPTCY ☜140(3) — STOCKBROKER — CONVERTED STOCK — PLEDGED STOCK.

Where broker, having authority to hypothecate customer's stock, converts part thereof and pledges remainder, and with it pledges stock of other customers without their consent, and pledgee, upon broker's bankruptcy, sells such stock, the claim of the first customer, where result of conversion is net credit balance in his favor, is equal to claims of latter customers, whose stock was pledged without authority.

10. BROKERS ☜26—STOCKBROKERS—MARGIN CUSTOMERS.

The margin customer is the owner of the securities which the broker is carrying for him, and they become his absolutely the moment he pays any amount outstanding against him.

11. BROKERS ☜24—STOCKBROKERS—HYPOTHECATION—STOCK OWNED BY CUS-TOMER.

While broker may not hypothecate stock of cash customer, he may do so with respect to stock of margin customer.

12. BROKERS ☜35—STOCKBROKERS—CONVERSION OF STOCK—MARGIN CUS-TOMER.

Stockbroker has no right to convert to his own use the securities of a margin customer.

13. BANKRUPTCY ☜322—STOCK—LIQUIDATION STATEMENT—VALUE OF STOCK.

In making up the liquidation statement, or restating account of margin customer, a part of whose stock had been converted by bankrupt broker, the value of the securities should, generally speaking, be taken as of the date of the filing of the bankruptcy petition.

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

14. BANKRUPTCY ⬯140(3)—STOCKBROKERS—CONVERTED STOCK—PRESUMP-
TION.
   Where broker, before bankruptcy, converted a part of customers' stock,
leaving unconverted a certain amount of similar stock, there is no pre-
sumption that he selected the stock of margin customers for conversion,
leaving untouched the stock of cash customers.

15. BANKRUPTCY ⬯140(3)—STOCKBROKER—TRACED STOCK—MARGIN CUS-
TOMER.
   Where the number of shares of certain stock owing by bankrupt stock-
broker to long customers, after deducting number of shares traceable by
certificate, was 4,120, but broker at time of bankruptcy had converted
all but 1,920 shares, margin customer, who can trace his 1,000 shares, is
entitled to lien for $1000/4120$ of the value of 1,920 shares of stock, but as to
balance is a general creditor.

16. BANKRUPTCY ⬯140(3)—STOCKBROKERS.
   Where bankrupt broker converted some of the shares of certain stock
owing by him to long customers, the failure of certain customers to
prove their claim for pro rata share of the unconverted stock, because
of failure to trace their stock, cannot enlarge the pro rata share of those
who have traced their stock.

17. BANKRUPTCY ⬯140(3) — STOCKBROKER — TRACED STOCK — RECLAMATION
OF STOCK.
   Though shares of certain stock held by bankrupt broker are insufficient
to satisfy long customers for whom he held such stock, a customer who
can identify his stock by certificate number is entitled to reclaim that
stock or its proceeds.

18. BANKRUPTCY ⬯140(3)—STOCKBROKER—PRESUMPTION.
   Where bankrupt stockbroker holds fewer shares of certain stock than
are necessary to satisfy claims of long customers, having legitimately us-
ed stock under terms of agreement to cover short sales, the broker pre-
sumptively utilized only those securities which he had a right to lend,
leaving unaffected securities paid for by cash customers.

19. BANKRUPTCY ⬯140(3)—STOCKBROKERS—LONG STOCK HELD AS SECURITY.
   Though margin customer's long stock and cash balance were held by
broker as security for short stock, the long stock was owned outright by
customer, whose position upon broker's bankruptcy was no different from
that of a cash customer, who had had no marginal transactions.

20. BANKRUPTCY ⬯340—STOCKBROKERS—TRACING OF STOCK—ADDITIONAL
PROOF—DISCRETION OF COURT.
   Where proof submitted to master failed to trace the stocks of customers
of bankrupt stockbroker, whether master, after submitting report, shall
take additional proof is discretionary with court.

21. BANKRUPTCY ⬯340—STOCKBROKERS—TRACING OF STOCK.
   Where proof submitted to master in bankruptcy proceedings of stock-
broker consisted merely of accounting of bankrupt with company to
whom stock had been pledged, where bankrupt's office was in San Fran-
cisco and hearing was in New York, and where many of the claimants
lived a distance from New York and had merely filed their claims and
given their depositions, court will allow master to hear additional proof
and permit customers, who had failed to trace stock, to follow claim into
pledgee's books.

22. BANKRUPTCY ⬯368—STOCKBROKERS—PROCEEDINGS—TRUSTEE'S COMMIS-
SIONS—COSTS.
   On bankruptcy proceedings of stockbroker, trustee's commissions are
calculated on funds which do not include either securities or their pro-
ceeds which claimants have successfully reclaimed.

23. BANKRUPTCY ⬤⟶272—STOCKBROKERS—TRUSTEE'S ATTORNEY'S FEES.
    On bankruptcy proceedings of stockbroker, allowance to trustee's attorney cannot be made out of securities or their proceeds, which claimants have successfully reclaimed.

24. BANKRUPTCY ⬤⟶481—STOCKBROKERS—PROCEEDINGS—COSTS — ALLOWANCE TO SPECIAL MASTER—STENOGRAPHER'S EXPENSES.
    On bankruptcy proceedings of stockbroker, the allowances to the special master and expenses for stenographic minutes must come preliminarily out of the general estate; if that is not sufficient they should come pro rata out of securities or their proceeds available to least favored claimants, and, if not satisfied by such securities, out of securities of most favored claimants.

25. BANKRUPTCY ⬤⟶272 — STOCKBROKERS — PROCEEDINGS — EXPENSES — ACCOUNTANT'S FEES.
    On bankruptcy proceeding of stockbroker, the expenses of engaging accountant to unravel details contained in the books of bankrupt's pledgee, so as to enable claimants to trace their stock, should be apportioned among claimants, except such as could trace stock without accountant's aid.

In Bankruptcy. In the matter of J. C. Wilson & Co., bankrupts. On objections to report of special master. Approved, except as set forth in opinion, and saving corrections in figures, which master may make, and any necessary recasting of accounts.

J. C. Wilson & Co. were stockbrokers doing business in San Francisco, Cal., with various branch offices in the United States and Canada, all of the business of the branch offices passing through the main office at San Francisco. Wilson held seats for the benefit of the firm in the New York Stock Exchange, the Chicago Board of Trade, and the San Francisco Board of Trade. J. C. Wilson & Co. did not trade directly on the New York Stock Exchange, but transacted all their Stock Exchange business through a New York correspondent, Harris, Winthrop & Co., who were also members of the New York Stock Exchange, and thus were entitled lawfully to divide commissions as fellow members. A private wire connected the two brokers' offices. J. C. Wilson & Co. took orders from their customers to buy or sell stocks and bonds on the New York Stock Exchange, and transmitted the orders to Harris, Winthrop & Co. by wire for execution, without the knowledge of the customer and without disclosing the customer's identity to Harris, Winthrop & Co. In addition, J. C. Wilson & Co. were themselves speculating on the New York Stock Exchange through Harris, Winthrop & Co. without distinction. So far as Harris, Winthrop & Co.'s books show, J. C. Wilson & Co. were marginal customers of that firm and signed the usual hypothecation agreement, which permitted Harris, Winthrop & Co. to pledge the securities carried in the customers' margin account for any amount without notice, all transactions to be subject to the rules of the New York Stock Exchange. As soon as Harris, Winthrop & Co. reported to J. C. Wilson & Co. that an order had been executed, J. C. Wilson & Co. immediately notified their customer in the same manner as if they had executed the order and without mentioning Harris, Winthrop & Co.'s name. The customer paid J. C. Wilson & Co., if it was a "cash" order, a day or so after notice of the execution of the order, but not in all cases simultaneously. Owing to war conditions the New York Stock Exchange was closed on July 30, 1914, and so remained until December 12, 1914. On August 13, 1914, the suspension of J. C. Wilson & Co. was announced on the Stock Exchange. On November 7, 1914, a bankruptcy petition was filed against J. C. Wilson & Co. in California, and adjudication was had on November 24, 1914. On December 5, 1914, Mr. Solinsky was appointed receiver, and on December 21, 1914, was elected trustee. In aid of the trustee, Mr. Dexter was appointed ancillary referee on January 8, 1915, and subsequently special master to ascertain the rights of all parties in and to the

money, stocks, and other securities in the hands of Harris, Winthrop & Co., and in and to the proceeds resulting from the sale of the New York Stock Exchange seat of J. C. Wilson & Co.

The report of the special master is now before this court, and numerous objections have been filed on behalf of various persons. When the New York Stock Exchange reopened on December 12, 1914, Harris, Winthrop & Co. sold the greater portion of the securities which they were "carrying" for J. C. Wilson & Co., and thus satisfied their lien for the unpaid debit balance of J. C. Wilson & Co., returning the surplus cash and securities to the Guaranty Trust Company to hold for the joint account of the trustee and of Harris, Winthrop & Co. The amount realized for the securities thus sold was the sum of $481,113.64. There were left in the hands of Harris, Winthrop & Co. (1) $13,218.03, the balance of the proceeds of the stocks sold, and (2) certain unsold securities which are set forth in detail in the special master's report. This cash and these securities constitute the fund now in custodia legis, in which the various claimants, all of whom were customers of J. C. Wilson & Co., are interested. The Stock Exchange appeared specially, denying the jurisdiction of this court, and, since the institution of this ancillary proceeding, the Stock Exchange seat of Wilson has been sold for $67,000, but is still held by the Stock Exchange, which, however, does not make any adverse claims for itself, but only for its member, Harris, Winthrop & Co., until released. There are numerous claimants for the securities or their proceeds, and the special master has filed his report, passing on the claims presented to him.

The foregoing is a brief abstract of so much of the special master's report as is necessary to understand the general situation. Fuller details as to the facts may be had by resort to the special master's report.

Harold Remington, of New York City, for trustee.

McElheny, Bennett & Sicher, Dudley F. Sicher, Reynolds, Richards & McCutcheon, George H. Richards, Robert F. Little, White & Case, Mr. Jenkins, Pruyn & Whittlesey, Henry B. Singer, Eli Thomas Scott, H. S. Marx, Paul R. Gordon, McDonnell & Lebett, Harold C. Mitchell, Charles L. Griffin, William L. Turner, David G. George, Henry W. Webber, William A. Ulman, Walter E. Meyer, Max Lowenthal, and Murray, Prentice & Howland, Duane R. Dills, Noble, Estabrook & McHarg, and Arnon L. Squiers, all of New York City, for various claimants.

MAYER, District Judge (after stating the facts as above). The careful and comprehensive report of the special master renders unnecessary reference to many details. It will conduce to a clear understanding to point out in what respects there is agreement or disagreement with the views of the special master in respect of the principles of law involved, making such reference to particular claims as may be illustrative or otherwise regarded as desirable.

The master has allocated the claims of those urging reclamation into two general classes, viz. class A and class B, placing the claims of superior equity in class A, and those of inferior equity in class B, and in addition he has dismissed certain claims, leaving such claims in the position of general creditor claims. Apparently the fund is insufficient to satisfy all class A claimants, and thus at the outset an interesting question arises, which is well exemplified by the situation of the claimant Rolph.

Rolph's Claim and the Doctrine of Pippey's Case.

As the result of transactions detailed in the testimony and in the master's report, it appears that on July 30, 1914, Wilson & Co. (hereinafter called Wilson) were holding 300 shares of Mexican Petroleum common for Rolph, for which Rolph had paid in full, and 100 shares of the same stock, upon which Rolph owed Wilson a debit balance. There is some controversy as to whether, in respect of the transactions, Rolph was a margin trader, or had bought these 300 shares outright. As I agree with the conclusion of the master that the 300 shares were bought outright and fully paid for, reference to the testimony is unnecessary. It may, however, be remarked, in addition to other facts which fully justify this conclusion, that the testimony shows that no interest whatever was credited Rolph on the cash balance arising from his several previous sales, although it was the invariable custom of Wilson to charge interest on a marginal account, if it ran only for a day. To those familiar with transactions of this character, this failure to credit interest is almost conclusive on the point that Rolph was not a margin trader. In regard to the last 100 shares purchased, upon which there was a debit balance against Rolph, I have no doubt that the master was right in holding that this purchase was in class B, and that Rolph could recover the proportion indicated by the master only on payment of his debit balance.

I will therefore leave this last purchase and proceed to consider the status of the 300 shares. These 300 shares were hypothecated by Wilson without authority with Harris, Winthrop & Co. (hereinafter called Harris). They were not among the securities sold by Harris to satisfy his pledge, and thus survived the liquidation. Rolph contends that he is now entitled to these identical 300 shares.

[1] There are other claimants whose securities were fully paid for and hypothecated without right by Wilson with Harris, and these securities, having been sold by Harris after the filing of the bankruptcy petition, did not, therefore, survive the liquidation in kind. In respect of such cases the special master has held, where the claimant has successfully traced, that the claimant is in class A and entitled to a lien on the proceeds. Such claimants insist that Rolph is in precisely the same situation as they are, and that the mere accident that Rolph's 300 shares have survived liquidation does not give him equities superior to them. The proposition thus advanced by those opposing Rolph's contention seems obvious upon simple principles of equity, for nothing is better settled than that equity will treat alike those similarly situated. Rolph, however, presses the point that a different view was entertained by the Circuit Court of Appeals for this circuit in the case of In re T. A. McIntyre & Co. (Appeal of Pippey) 181 Fed. 955, 957, et seq., 104 C. C. A. 419.

In view of its importance in the pending controversy, I have thoroughly examined the record on appeal in Pippey's Case. In that case the involuntary petition against McIntyre & Co., stockbrokers, was filed on April 24, 1908. About March 4, 1907, McIntyre & Co. obtained a loan from the Metropolitan Trust Company of $200,000 and

deposited as collateral thereto, a large number of stocks and bonds. On April 23, 1908, the day before the filing of the petition in bankruptcy, McIntyre & Co., without right, pledged Pippey's stock with the Metropolitan Trust Company as part of the collateral to the loan aforesaid. On April 25, 1908, Pippey demanded from the Trust Company his certificate of stock, which was still in the Trust Company's possession, and whose identity had been preserved. It is unnecessary to describe in further detail Pippey's efforts, which are sufficiently set forth in the opinion of the court in 181 Fed. at page 957 et seq., 104 C. C. A. 419.

The master reported (pages 39 and 40) that after the bankruptcy, and on April 24, 1908, the Trust Company applied certified checks for $70,000 toward the payment of the $200,000 loan, reducing the principal thereby to $130,000 and thereafter the Trust Company from time to time sold the securities, applying the proceeds in reduction of the debt. On May 6, 1907, after applying the proceeds to the payment of the principal and interest on the debt, there was a cash credit to McIntyre & Co. for their estate in bankruptcy of $832.16 and the following securities: 300 shares of International Power Company common unclaimed, 200 shares of American Can Company preferred (Hudson), 18 shares of Pullman Company (Pippey), and 66 shares of United States Steel Preferred. This cash and these securities, by order of court were redeposited with the Metropolitan Trust Company, to remain subject to order of court. The task before the master was to determine the rights of the various claimants to this balance of cash and these shares of stock which had survived the liquidation by the Metropolitan Trust Company. The master then proceeded to examine each claim:

Pippey (42). The master held that Pippey had identified his 18 shares of Pullman Company stock, and that this stock must bear its proportionate share of the burden of the loan, and that Pippey was entitled to share pro rata with others similarly situated in said surplus of money and securities. The Circuit Court of Appeals pointed out that the conduct of the stockbrokers in pledging Pippey's stock with the Metropolitan Trust Company amounted to larceny. The result was that Pippey had the highest kind of equity, and the Circuit Court of Appeals held that he was entitled to recover his stock or the proceeds free of any burden to share pro rata with others.

Ellen J. Sedgwick and Fred L. Bishop (45). The master awarded to these claimants 60 shares United States Steel preferred (10 to Bishop and 50 to Mrs. Sedgwick), under the same circumstances and principle under which a similar award has been made in this case by common consent to Allie M. Powell. There was no petition to revise and no appeal from the master's order in this regard.

Charlotte B. Miller (47). On April 1, Mrs. Miller, through her son as her agent, bought through McIntyre & Co. 12 shares of United States Steel preferred, which stock was paid for on April 3, 1908. McIntyre & Co. were requested to have these 12 shares of stock transferred to the name of Mrs. Miller and thereupon to send same to her. Between April 7, 1908, and the date of the failure, April 24, 1908, Mrs. Miller's son called at the Syracuse office of McIntyre &

Co. on several occasions and asked for the certificate of stock. The last time he called was on the day before the failure. At the date of the bankruptcy the market value of these 12 shares was $1,197. On May 1, 1907, a demand was made at the office of McIntyre & Co. in New York for the stock, but the stock was never received by Mrs. Miller. This stock was traced by Mrs. Miller into the Metropolitan Trust Company loan, and (without setting forth further details) the master held that Mrs. Miller had successfully traced her stock, and that her claim was $1,197, and that she was entitled to share pro rata. So, also, the District Court held. Undoubtedly Mrs. Miller's status as matter of equity was equal to that of Pippey; but as she did not petition to revise, nor appeal, she was apparently satisfied with the disposition below.

Julia A. Stone (47). Mrs. Stone, through her husband, on April 20, 1908, bought 20 shares of Pennsylvania Railroad Company stock, and paid in full on April 21, 1908, when the certificates were delivered to McIntyre & Co. On the same day McIntyre & Co. pledged Mrs. Stone's stock with the Metropolitan Trust Company. The market value of the shares at the date of the bankruptcy was $1,185. On April 29, 1908, the Trust Company sold Mrs. Stone's 20 shares of Pennsylvania stock for the net sum of $1,211.05, and applied the proceeds in liquidation of the loan. On the date of the failure McIntyre & Co. owed to various customers in all 1,582 shares of Pennsylvania stock. The master held that Mrs. Stone had traced her stock, and, placing her claim at $1,185, held that she shared pro rata. Here, also, undoubtedly, the position in equity of Mrs. Stone was equal to that of Pippey; but Mrs. Stone neither petitioned to revise nor appealed. (See below.)

Dyke Quackenbush (50). In regard to this claim it was held that McIntyre & Co. were authorized by Quackenbush to pledge his stock, and the master correctly stated:

"The claims of Pippey and others, whose stocks were wrongfully converted by McIntyre & Co., are superior to any claim of Quackenbush, and the surplus money and securities are not sufficient to satisfy such prior claims. Claimant has therefore failed to establish any claim herein, and his petition must be dismissed, with costs."

So, also, held the District Judge, and from this there was no appeal.

Mary H. Hudson (54). Mrs. Hudson was the owner of the 200 shares of American Can preferred, which were not sold by the Trust Company. The transactions with her are sufficiently described in 181 Fed. 959, 104 C. C. A. 419, not to require repetition. It will be noted, however, that the Circuit Court of Appeals treated her equity as inferior to that of Pippey.

It is not necessary to discuss the status of Connor (see also appeal of Grace), Amos, and others, because the Miller and Stone Cases are sufficiently illustrative, and Connor, Amos, and others did not petition to revise nor appeal in this proceeding.

From the foregoing abstract it will be seen that the Circuit Court of Appeals had before it only the claims of Pippey and Mrs. Hudson. Both Pippey and Mrs. Hudson had traced their stocks, and those stocks, having survived the liquidation, were in existence and available,

Undoubtedly, the claims of Mrs. Miller and Mrs. Stone, for illustration, were equal in equity to the claim of Pippey.

As, however, those similarly situated with Pippey did not appeal, the Circuit Court of Appeals had no grievance before it on the part of those claimants. The case was not like Matter of Pierson, 233 Fed. 519, 147 C. C. A. 405, and 238 Fed. 142, 151 C. C. A. 218, where the general creditors via the trustee were before the court, and the court held that the mere fact that certain customers (like Cochran) had not made a claim, could not serve to increase the shares of those who did claim (under Duel v. Hollins, 241 U. S. 523, 36 Sup. Ct. 615, 60 L. Ed. 1143), and to decrease a fund available for general creditors. In Pippey's Case, Pippey was claiming his specific Pullman stock by virtue of his title, and there was no other claimant before the Circuit Court of Appeals who was similarly situated.

If, however, Mrs. Miller or Mrs. Stone and the others similarly situated had also appealed, is it to be supposed that the court would have held that Pippey could reclaim all of his stock, and others similarly situated must leave the court empty-handed, because of the fortuitous circumstance that the pledgee after bankruptcy had sold the stock of Mrs. Miller and Mrs. Stone, for instance, and had not sold the stock of Pippey?

It is true that the opinion of the court uses certain general language, but that language must be construed in respect of the facts before the court. The court was not called upon to adjust equities between Pippey and others similarly situated who did not complain. In the record on appeal there is a brief on behalf of Mrs. Stone, who takes the role of appellee. Mrs. Stone not only did not appeal, but, on the contrary urged the affirmance of the order below as follows:

"The order should be affirmed to the extent of awarding contribution to this appellee."

[2] No reference whatever is made in the opinion of Judge Lacombe to the brief or the argument on behalf of Mrs. Stone, and from this it is obvious that the court did not feel called upon to award relief to those who did not ask it, but who, on the contrary, were satisfied with the disposition below. It is true that the court held that the admiralty principle of general average was not applicable, and that the pledge should not be treated as a common adventure; but it did not disturb the proposition that it is the character of the equity which determines how any particular claim shall be classified. The case is quite different from one where a pledgee rightly sells collateral prior to a bankruptcy. In the absence of fraud or collusive arrangements, the result of such a sale is one of the hazards which may befall persons in a business of this character. If, however, it be held that, after a petition in bankruptcy has been filed, the pledgee, by selecting for sale some stocks and not others, can thereby save some stocks intact for the owners without the burden of contribution, and not others, it can readily be seen that the door will be opened for the most indefensible kind of favoritism, and possibly for corrupt bargains between the owners of securities and the pledgee. Indeed, a pledgee of his own motion, without any agreement with owners of securities, could easily safeguard

his friends to the detriment of others who were strangers to him. I am fully satisfied, therefore, that Rolph is in the same position as other class A claimants.

[3] Rolph, however, should not be in a worse position than those whose securities were sold by Harris on December 12, 1914, or soon after. Since then Mexican Petroleum has appreciated in value. Ordinarily the value of the stock would be taken as of November 7, 1914, the date of the filing of the petition in bankruptcy. In this case, however, war conditions presented an extraordinary situation. There was not a true market between the closing and the opening of the Stock Exchange, and therefore the value must be ascertained by other than ordinary methods, more particularly as the first sale of Mexican Petroleum on the Exchange was not until December 15, 1914, three days after the Exchange opened. The last previous sale was on July 30, 1914. I think it is fair to hold, in the circumstances, that the stock must be valued as of December 15, 1914, to wit, 56, or, in money, $16,800 for the 300 shares. Rolph, if he desires, may pay into the fund $16,800 and have his stock, and upon the basis of $16,800 as a class A claimant he may share and contribute in the fund. In re T. A. McIntyre & Co. (Appeal of Mary H. Hudson) 181 Fed. 959 et seq., 104 C. C. A. 419.

### Unjust Enrichment—Claim of Louis Rosenthal.

The claim of Rosenthal may be taken as a good example of the claims for unjust enrichment. Rosenthal bought 200 shares of Southern Pacific on July 29th, and paid in full on July 30th, which was the day when the delivery and payment were to be made. Harris received this stock, and subsequently applied it in reduction of Wilson's indebtedness to Harris. The master awarded a lien to Rosenthal on the fund because it was unjustly enriched by this application, and Rosenthal was put in class A because he had paid for his stock in full.

There is some danger of a mistaken application of the principle of unjust enrichment, arising from the hardship which an adverse ruling visits upon such a claimant as Rosenthal. But it is important not to be misled by a sympathetic desire to make good, as against other claimants, and general creditors, some obvious wrong committed by the broker against his customers. The principle has been tersely stated in Multnomah County v. Oregon Nat. Bank (C. C.) 61 Fed. 912, as follows:

"It is settled that a person may follow and reclaim his property, wrongfully appropriated by another, so long as he can find it. If its form has been changed, he may follow the substantial equivalent of his property, in whatever form. The property into which his own has been changed is impressed with a trust in his favor. But the great weight of authority is against any extension of the rule beyond this."

[4, 5] Where, as in Gorman v. Littlefield, 229 U. S. 19, 33 Sup. Ct. 690, 57 L. Ed. 1047, and Duel v. Hollins, 241 U. S. 523, 36 Sup. Ct. 615, 60 L. Ed. 1143, the claimant traces and finds his security or securities of the same kind, he is entitled to that specific security or its equivalent, or his pro rata share, as the case may be. Where, however, prior to insolvency, there has been a conversion into money, he

is unable, of course, to trace the security in kind; but he must show that the proceeds of the conversion have gone into a particular fund, and he must be able to identify those proceeds as a part of that fund. Every conversion, theoretically at least, unjustly enriches the fund ultimately found credited to or in the hands of the converter; but that is not enough. There is nothing in the oft-cited opinion of Mr. Justice Bradley in Frelinghuysen v. Nugent (C. C.) 36 Fed. 229, to the contrary. An extended review of the cases on this subject seems unnecessary, and it remains only to analyze In re Ennis, 187 Fed. 720, 109 C. C. A. 468, so far as that case concerns the claim of the People's Bank. The facts in that case were as follows:

"On April 9, 1909, the People's Bank ordered sold through the bankrupts' Passaic branch $15,000 of certain bonds. The order was executed upon the same day, and the bonds were sold to one Cohen. On April 12, 1909, holidays intervening, the bonds were delivered to the bankrupts at New York. The messenger who delivered the bonds was instructed to obtain a certified check for their proceeds and to deposit the same in a New York bank. The messenger, however, delivered the bonds upon an uncertified check drawn upon the Mechanics' Bank and deposited that. The condition of the bankrupts' bank account upon said day would have permitted the certification of a check for the amount of said bonds. On April 13, 1909, the bankrupts suspended, and payment of said uncertified check was refused by the bank upon which it was drawn. The check received from Cohen for the purchase price of said bonds was deposited to the credit of the bankrupts, in said Mechanics' Bank. The People's Bank had no account with the bankrupts, except a deposit account of the bankrupts, the balance due upon which was deducted by the master from the claim of said bank."

The master held that a constructive trust arose, and in this view he was sustained by the Circuit Court of Appeals. Judge Noyes stated:

"The proceeds of the claimant's bonds constituted trust funds, which were traced into the Mechanics' Bank and have unjustly enriched the bankrupts' estate."

From the statement of facts above outlined it is quite clear that the court based its decision, inter alia, upon the fact that these proceeds were clearly traced into the Mechanics' Bank.

In the Rosenthal claim at bar, and in similar claims, the difficulty is that the proceeds cannot be traced. It may or may not be that these proceeds are somewhere in the cash and securities heretofore or now held by the Guaranty Trust Company; but who can say? There is no doubt that the Wilson estate was unjustly enriched, because the conversion of these 200 shares of Southern Pacific resulted in reducing the indebtedness of Wilson to Harris pro tanto; but that is not enough. If the doctrine of unjust enrichment is to be applied to this case, then it follows that every conversion, whether the proceeds thereof be traced or not, will give a claimant of this character remedies heretofore never accorded. All that will be necessary will be to show that securities were converted without the paramount further requirement of demonstrating beyond question that the proceeds of the conversion are in a fund where they can be unequivocably identified. In re A. D. Matthews' Sons, Inc., 238 Fed. 785, 151 C. C. A. 635.

[6] The question, of course, is not free from doubt, but I am of opinion that the master erred in this regard, and that the claimants

252 F.—41

urging the "unjust enrichment" theory must be regarded as general creditors. The Wilson failure is not similar to the A. O. Brown, Hollins, Lathrop Haskins, Ennis, Pell, Van Schaick, or other Wall street failures. In these bankruptcies the Wall Street house had failed. In the Wilson case, the correspondent failed, not the Wall Street house. These bankruptcies had many funds, and the Wall Street house itself was not a fund. In the Wilson case, the Wall Street house itself (Harris) was the fund. In the above failures, it was necessary for the claimant to trace his given property or the proceeds of it into a given bank loan or fund, or point to the property in the broker's hands. This is not true in the case at bar, for the reason that there was only one fund. The fund was the Harris pledge. The fund was the Wall Street itself (Harris). Therefore, where a customer of Wilson traces property into the Harris pledge before insolvency, and shows that Harris sold the property and had the proceeds before insolvency, and that it remained with Harris (that is, prove that it was not paid by Harris to Wilson, or used by Wilson after that time), he is entitled to reclaim, and, if the stock was wrongfully pledged by Wilson with Harris, under either the Pippey or Bamford rulings, he is in class A.

Godwin's Claim and the Doctrines of Ex parte Bamford, 187 Fed. 721–725, 109 C. C. A. 468, and Ex parte Braun, 187 Fed. 726, 109 C. C. A. 474.

The master's report states:

"To summarize: I find that Godwin has traced title to the following shares in Harris, Winthrop & Co.'s pledge:

| | |
|---|---:|
| 100 shares Interborough Metropolitan preferred | $ 5,089.75 |
| 100 shares Great Northern preferred | 11,914.75 |
| 100/350 shares Missouri Pacific (330 shares sold for $3,427.43), which amounts to | 979.26 |
| Total | $17,983.76 |

"He is entitled to deduct from his indebtedness to Wilson the purchase price of 400 Reading (1/2) shares, or $34,200, for having absolutely converted this stock.

| | |
|---|---:|
| His indebtedness was | $41,991.75 |
| Deducting purchase price of 400 Reading | 34,200.00 |
| Leaves his net indebtedness | $7.791.75" |

In regard to the conversion of the Reading stock the master found as follows:

"Godwin was also long of 400 shares of Reading (1/2 shares) purchased by Wilson for his account June 16, at 170¼, aggregating $34,200. This was, without his customer's authority, sold short by Wilson through Harris, Winthrop & Co. for at the bankruptcy Wilson was 'short' with Harris, Winthrop & Co. 3,260 shares, which the latter firm subsequently covered, and charged the purchase price to Wilson's account. Wilson at the time of the suspension was 'short' of Reading with Harris, Winthrop & Co. and had no Reading stock in his possession in pledge or elsewhere. If it had been lawfully borrowed to complete a short sale, on Harris, Winthrop & Co.'s 'covering' such sale in December, the 400 shares of Reading should have reappeared in the Wilson account as loaned stock returned. The conclusion is irresistible that the Reading stock was prior to the bankruptcy not borrowed, but actually sold and de-

livered, viz. converted, by Wilson. This was 'a grave dereliction of duty' on Wilson's part. and entitled Godwin to deduct the purchase price ($34,200) from the balance due Wilson."

The conclusion of the master was as follows:

"I think that as long as any part of his indebtedness existed, the hypothecation of his securities was not unlawful, and he should be put in class B, rather than in class A. His equities are not as high as in the case of full-paid securities wrongfully hypothecated. In re Ennis, Ex parte Braun, 187 Fed. 726 [109 C. C. A. 474], distinguishing the decision, In re Ennis, Ex parte Bamford, 187 Fed. 720 [109 C. C. A. 468], made by the same court simultaneously. * * * On payment of his debit balance, $7,791.75, I find that Godwin is entitled to a lien on the surplus for the sale price of his securities, $17,983.76; but he should be placed in class B, subject to contribution to the expenses and the 'burden of the loan.' "

Godwin contends that the master was wrong, and that because of the conversion of the Reading stock he should be placed in class A, and he relies upon the authority of In re Ennis, Ex parte Bamford, 187 Fed. 720, 109 C. C. A. 468, and the so-called Stilwell Act, being Laws of New York 1913, c. 500, subdivision 2.[1] I agree with the master in his conclusion as to the facts, and I shall therefore assume that the 400 shares of Reading were converted as the master found. It is also clear that Godwin was a margin trader, who had authorized Wilson to deal with his securities in accordance with the following authority:

"It is agreed between broker and customer: (1) That all transactions are subject to the rules and customs of the New York Stock Exchange and its Clearing House. (2) That all securities from time to time carried in the customer's marginal account, or deposited to protect the same, may be loaned by the broker, or may be pledged by him either separately or together with other securities, either for the sum due thereon or for a greater sum, all without further notice to the customer."

[7] The Stilwell Act, so called, was a penal statute. It denounced certain conduct as unlawful, and provided punishment therefor. This act, however construed, cannot per se affect the equities existing between different claimants to securities or their proceeds. Those equities are, of course, to be determined by principles of equity, and the Stilwell Act, in a case such as that at bar, is useful only so far as it may help to determine the kind of act or transaction of which the failing stockbroker was guilty. If, therefore, a stockbroker violates this statute, such violation (all other things being equal) might place a claim in the most favored class. Entertaining this view, it is unnecessary for me to determine whether the word "and," in section 2 of

1 Subdivision 2 of the so-called Stilwell Act provides:

"2. Having in his possession stocks, bonds or other evidences of debt of a corporation, company or association belonging to a customer on which he has a lien for indebtedness due to him by the customer, pledges the same for more than the amount due to him thereon, or otherwise disposes thereof for his own benefit, without the customer's consent, and without having in his possession or subject to his control, stocks, bonds or other evidences of debt of the kind and amount to which the customer is then entitled, for delivery to him upon his demand therefor and tender of the amount due thereon, and thereby causes the customer to lose, in whole or in part, such stocks, bonds or other evidences of debt, or the value thereof."

this statute, is to be construed as conjunctive or disjunctive; and it is also unnecessary for me to determine whether, as matter of fact, Wilson, in dealing with Godwin's Reading shares (in view of the "confirm" order, supra), was guilty of a violation of this statute. It is perfectly plain, irrespective of the Stilwell Act, that these Reading shares were converted by Wilson and that such conduct was a grave dereliction of duty on Wilson's part.

The question thus remains as to whether Ex parte Bamford and Ex parte Braun mean that the mere conversion per se places a claimant such as Godwin in class A, or whether the court, in determining the equities, must also merely ascertain whether the conversion wiped out the debit balance, or must look further and examine all the acts of the parties and the condition of the whole account; i. e., whether debit or credit.

At the outset it will conduce to clearness to point out what the situation would have been if Wilson had not converted Godwin's Reading and what the situation was so far as Godwin knew. Godwin owed $41,991.75. Wilson was supposed to have on hand, whether in his own "box" or in a pledge, 100 Interborough Metropolitan, 100 Great Northern, 100 Missouri Pacific, and 400 Reading, aggregating in value, at the figures of the master's report, $52,183.76; i. e., $17,983.76, plus $34,200. In other words, Godwin's securities were worth net $10,-192.04 (the difference between $52,183.76 and $41,991.75) on the basis of the purchase price of the Reading and the liquidation figures as to the remaining securities.

If the fact that his Reading had been converted had become known to Godwin, he would have had the choice of three courses: (1) To forgive the tort and allow his unconverted securities to remain in the possession and under the control of the broker with a debit balance against him—i. e., Godwin would owe the broker $7,791.75 on his margin account, against which the broker would hold Interborough Metropolitan, Great Northern, and Missouri Pacific; (2) to pay the $7,791.75 indebtedness, and thereupon receive from the broker the unconverted securities; or (3) to order the securities sold and take the net proceeds in cash.[2]

[8] So long as Godwin chose course (1), supra, and so long as Wilson kept these remaining "long" stocks, either in his "box" or in the Harris pledge, Wilson was fully within his rights, and, had that been the situation when Wilson failed, Godwin's claim would properly have been placed in class B, no matter how much the value of his remaining shares exceeded his debit balance either at the date of bankruptcy or as the result of the liquidation. The reason for this result (clearly explained in Ex parte Bamford) is that, under such circumstances, the Godwin securities would have been rightfully in the Harris pledge pursuant to authority duly conferred on Wilson by Godwin. If, however, Godwin had known of the conversion of his Reading, then he could have chosen courses (2) or (3), and could thus have saved to himself what was justly due him.

---

[2] I am excluding from consideration at this time, as irrelevant, any action which Godwin might have against the broker for damages for conversion.

The question then arises as to whether Godwin was properly placed in class B because the proceeds of the conversion of his Reading stock by Wilson were not enough in themselves to wipe out Godwin's debit balance. Godwin, to repeat, owed $41,997.75 on his margin account, and, after deducting $34,200, the purchase price of his converted Reading, an indebtedness of $7,791.75 remained. But this balance of $7,-791.75, representing Godwin's "net" indebtedness, does not state in dollars his net property rights from the standpoint of liquidation; to so treat it is fallacious. True, Godwin owed $7,791.75, but against this the broker had his remaining securities, of the value in the aggregate of $17,983.76, with the result that the true net property of Godwin, stated in dollars, was $10,192.04, which he would have had the right to receive if the conversion of the Reading had not been concealed from him. The master placed Godwin in class B because of his construction of Ex parte Braun. He said:

"In the Bamford Case the court found that there was a credit balance after crediting the value of the converted stocks. In the Braun Case there remained a debit balance."

A reading of the opinion of the Braun Case, without recourse to the record, may tend to some confusion. In the Bamford Case the court had laid down certain general principles, and had given the reasons therefor. In the Braun Case it is apparent that the court confined its opinion to making clear to the litigants the reason for the distinction between Braun's claim and Bamford's claim. I have deemed it desirable, therefore, to examine the record in both Ex parte Bamford and Ex parte Braun, and that examination will, I think, make clear the true meaning of the opinions in both of these cases.

In Ex parte Bamford it clearly appeared that the bankrupts, some time before the failure, had misappropriated shares of Shoe Machinery stock deposited with them as collateral. Some of Bamford's securities had been hypothecated to secure loans to the bankrupt brokers Ennis and Stoppani at the Mechanics' National Bank, and that bank had satisfied such loans by the application of a balance on deposit to the credit of the bankrupts and by a sale of a portion of the collateral, and had a surplus fund on hand, just as in the case at bar. Eighty-two shares of Safety Car Heating stock, which had been deposited by Bamford with Ennis and Stoppani as collateral, and were included in the securities hypothecated with the Mechanics' National Bank, were sold by the bank after bankruptcy, just as in the case at bar. Thirty shares of Patterson Saving Institution stock, which had likewise been deposited by Bamford with the bankrupts and had been included in the collateral delivered to the Mechanics' Bank, were not sold by the bank, and were turned over by the bank to the receiver in bankruptcy, and were in his possession, just as in the case at bar. When the master cast the account, he credited Bamford with the value of certain "long" stocks as per liquidation statement J. Turning to this liquidation statement J, it will be found that there was a net balance in favor of Bamford of $34,218.30. This net balance was obtained by crediting Bamford with the value of his "long" stocks and bonds at the time of the suspension of the brokers, and the value of same as if sold at the aver-

aged prices approximately at time of suspension, including 82 Safety Car and 30 Patterson Savings Institution. The total of credits was $172,521.50, against which Bamford owed $138,303.20, so that on this statement Bamford had a credit balance of $34,218.30.

In other words, in seeking to ascertain Bamford's true position, he was credited under the liquidation statement with the value of his securities as of the time of the suspension of the brokers. In "restating" Bamford's account, the master charged him with $138,303.20, the amount owed by him, and credited him with. only $147,371.25. This $147,371.25 did not include the Patterson Institution stock or the proceeds of the Safety Car stock. In liquidation statement J the Patterson Institution stock was credited at $14,992.50, and the 82 Safety Car stock at $10,157.75; total $25,150.25. Adding $25,150.-25 to $147,371.25 will give the $172,521.50 total credits in Bamford's favor shown in the liquidation statement. The "restatement" of Bamford's account, therefore, showed a credit balance in favor of Bamford of $9,068.05 ($147,371.25 minus $138,303.20), exclusive of the Patterson Institution stock and of the proceeds of the Safety Car stock. In the Bamford Case it made no difference that the master had not included the value of the Patterson Institution and the Safety Car stocks on the credit side of the "restatement" in favor of Bamford, because, exclusive of those two stocks, Bamford had a credit balance of $9,068.05 as above pointed out.

The "restatement" (although having no effect on the result) was inaccurate because, in order to ascertain the true state of the account, all of the debits should have been charged on the debit side, and all of the credits should have been credited on the credit side, as they were in liquidation statement J, for the purpose of ascertaining whether there was a debit balance against or a credit balance in favor of Bamford. The court said:

"Now, the report of the master 'restates' the account of the appellant with the bankrupts, and shows a substantial balance in favor of the appellant without counting the securities in question. This statement is made in view of liquidation as at the time of the failure, and shows that the bankrupts, according to their own account, had more securities and property of the appellant than the amount he owed, and that the securities in question were not required for the marginal purposes for which they were deposited."

The court continued:

"It further appears * * * that when the bankrupts failed they did not have in their possession or under their control the stocks they had purchased for the appellant, or corresponding shares. This proof might be insufficient to establish conversion at any particular time prior to the failure; but it does make out at least a prima facie case of conversion at some time prior thereto."

From the above it is clear that, inter alia, the court, in determining how to classify claims of reclaiming creditors, must ascertain (1) whether there was a conversion at some time prior to the failure, and (2) what the account between the parties was on a liquidation as of the time of the failure. From the foregoing observations as to the "restatement" by the master of the Bamford account, it will appear why the court in Ex parte Braun held the "restatement" there to be wrong.

In Ex parte Braun the master "restated" the account of Braun as follows:

Debit balance March 31, 1907 (Exhibit F)........................$76,550.77
100 shares Atchison bought April 1st............................ 10,787.50
Interest ....................................................... 149.66

    Total debits .............................................$87,487.93
Credit for dividends....................................$  925.00
100 Atchison sold April 13............................. 10,748.00
Value of "long" stocks after liquidation statement (Exhibit F)................................................. 72,050.00
                                                83,723.00

Deficiency to be charged against "deposit" stocks..................$ 3,764.93

Exhibit F was the liquidating statement:

| Date. | Price. | Amount. | Days Interest. |
|---|---|---|---|
| 1909. Mar. 31 Long | Balance | $76,550.77 | |
| | 200 Sloss | | |
| | 100 Sug. | | |
| | 400 Rdg. | | |
| | 200 Cop. | | |
| Depos. | 102 Safety Car | | |
| | 10 Pat. Sav. In. | | |
| | 20 1st Natl. Bk. | | |
| | at | | |
| | Divd. 20/2, 300 U. P. | | |
| | 1¾ 100 Sug. | | |
| Apl. 1 | 100 Atch..............107¾ | 10,787.50 | |
| | Int.................... | 149.66 | |
| | Bal.................... | 19,862.82 | |
| | | 107,350.75 | |

Cr.

| 1909. | | | |
|---|---|---|---|
| Apl. 1. | Divd. 20/2, 300 U. P................ | 750.00 | |
| 2. | Divd. 1—¾, 100 Sug................ | 175.00 | |
| 13. | 100 Atch..............107—⅝ | 10,748.00 | |

The following is a memorandum of long stocks and bonds at time of suspension, April 13, 1909, and value of same as if sold at the averaged prices approximately at time of suspension:

April 13.  200 Sloss ............................ 76    15,175.00
            100 Sug. ..........................135⅜    13,525.00
            400 Rdg. ..........................138⅜    27,700.00
            200 Cop. .......................... 78⅜    15,650.00
            102 Safety Car ....................124    12,635.25
            10 Pat. Sav. Inst. ...............500    4,997.50
            20 1st Natl. Bk. Pat. ...........300    5,995.00
                                    107,350.75

   13.  Balance .................................  19,862.82

The value of the "long" stocks, viz. $72,050, did not include 102 Safety Car at $12,635.25, 10 Patterson Institution at $4,997.50, and 20 First National Bank of Patterson at $5,995. , Taking all the items on both sides of the ledger into consideration, there was a balance in favor of Braun of $19,862.82. The master, however, when he "restated" the account of Braun, showed a deficiency of $3,764.93, and the court held that the master's restatement "was incorrect." The court said:

"The testimony is wholly insufficient to afford a basis for charging the appellant with the balance stated, nor does it definitely establish any balance."

This view seems to be supported by the figures, because, after charging Braun with the proper debit items and crediting him with the proper items, there was a balance of $19,862.82 in his favor.

From the foregoing it appears that Braun had a credit balance, and not a debit balance, as the master found. If the facts as to conversion had, been the same as in the Bamford Case, there could not have been any distinction in principle between the Braun and the Bamford claims. In the Bamford Case, however, the master had expressly found that some of Bamford's stock had been converted, and this was also found by the Circuit Court of Appeals. In the Braun Case, the master found that all of Braun's stocks were lawfully hypothecated. This the Circuit Court of Appeals did not find expressly one way or the other, but that court indicated doubt as to the fact, stating:

" * * * The testimony goes far to negative any right in the bankrupts to have the securities in question in the loan at the Mechanics' Bank. * * * "

And the court further said:

"But the testimony leaves the actual state of the account between the appellant and the bankrupts in a state of uncertainty. * * * The bankrupts were not carrying the appellant's 'long' stocks, which the statement purports to liquidate. But *when* they had been converted is not shown, so that the value at which their proceeds should have been credited does not appear, and it cannot be determined whether the appellant owed the estate or vice versa."

From this it must be obvious that the Braun Case was distinguished from the Bamford Case solely on the question of evidence. In the Bamford Case the conversion had been clearly shown as having occurred prior to the failure, while, according to the court, it was not shown in the Braun Case when the conversion occurred. The result in the Bamford Case was that the liquidation statement of the account clearly demonstrated that there was a credit balance in favor of Bamford, while in the Braun Case, because it was not shown when the securities were converted, the value at which their proceeds should have been credited did not appear, and consequently it could not be determined whether the appellant owed the estate or vice versa.

As a conclusion to the foregoing, the clear inference is that the Bamford claim was placed in class A because the conversion was shown to the satisfaction of the court, and the Braun claim was placed in class B because the conversion was not satisfactorily shown.

The confusion which has arisen in argument in construing the Braun Case is possibly added to by a misinterpretation of the second sentence of the opinion, where the court said:

"The account as 'restated' by the special master—whether rightfully or wrongfully—shows an indebtedness to the bankrupt estate, instead of a balance to the credit of the appellant."

When this sentence is read with the rest of the opinion, it will be found to be merely a statement of fact as to what the master held, and is not a statement of what the court held, for the court later in its opinion pointed out that it did not accept the "restatement" of the master. In view of the interpretations which have been placed by counsel upon these two opinions when read together, and of the construction of the law of these two cases by the master, it is desirable to state the principles to be deduced from, or which necessarily follow, the views expressed by the Circuit Court of Appeals in the Bamford Case.

[9] Once the basic propositions of the Bamford Case are accepted, it would be entirely illogical to hold that, in order to place a claimant in class A, the conversion of stock must per se amount to sufficient to wipe out the debit balance, without regard to the state of the whole account between the customer and the broker. Such a distinction, however, has been made by the master between, for instance, the Godwin claim and the Patterson claim in the case at bar. In the Patterson claim the conversion was sufficient per se to wipe out the debit balance, and the master therefore placed Patterson's claim in class A. But such cannot be the true test, either on principle or from the standpoint of fair and equitable consideration, based on the practical conduct of business of this kind. The true inquiry should be to ascertain whether, after and as a result of the conversion, the customer would have a credit balance in his favor on the whole account, or a debit balance. If he would have a credit balance, he could take courses (2) or (3) above mentioned; i. e., either to recover his securities by paying his debit balance or to obtain the net proceeds by ordering the securities sold. If, on the other hand, as the result of the conversion, there would nevertheless be a net debit balance against the customer, then, if the securities were sold, he would still remain the debtor of the broker, or, if he paid his debit balance, he would nevertheless be out of pocket when the broker delivered the securities to him.

[10-12] Lastly, in this connection, it is urged that margin customers are on a different basis from those who have paid for their securities outright. There is no logical ground for this distinction. The margin customer is the owner of the securities which the broker is carrying for him, and they become his absolutely the moment he pays any amount outstanding against him. The broker, it is true, may not hypothecate the securities of the outright owner, and may hypothecate those of the margin customer; but he has no right to convert to his own use the securities of the margin customer, and when he does so the results follow which are pointed out in Ex parte Bamford. This

rule applies where there is a conversion of any of the securities originally rightfully hypothecated.

In view of the importance of the question in this case, and with the hope- that a clear rule may be laid down, which will be controlling in proceedings of this character, I will summarize what I believe to be the propositions applicable under this head:

First. As between securities hypothecated with authority and those hypothecated without authority, obviously the latter have the superior equity.

Second. Where securities are hypothecated without authority, or, though hypothecated with authority, are in part subsequently converted, the securities remaining stand on equal equities, provided that, as the result of the conversion of securities originally rightfully hypothecated, the restatement of the whole account shows a credit balance in favor of the customer.

. Third. Where securities have been rightfully hypothecated, and there has not been any conversion of any of such securities, then the equity of a customer owning such securities is inferior to that of customers owning securities as described in paragraph first and second.

Finally, it may be observed that the court in the Bamford Case proceeded upon broad grounds, holding that "the extent of the wrong is a measure of the equity," and the court did not deal academically with the questions there considered. It brushed aside Bamford's "mere nominal indebtedness," and based its conclusions upon the real state of the Bamford account. On the other hand, a conversion of part or all of the securities of a customer should not entitle his claim for that reason alone to be placed in class A. Before he should be entitled to that classification, it should clearly also appear that as a result of the conversion there is a net credit balance on the whole account in his favor.

[13] Finally, in making up the liquidation statement, or "restating" the account, the value of the securities should, generally speaking, be taken as of the date of the petition in bankruptcy. In this case, for reasons above stated, it must be taken as of the opening of the Stock Exchange, or the earliest sale thereafter of the particular kind of stock in question. Thus Godwin's claim should be placed in class A, and a claim like Marsan's in class B.

*The Extent of the Presumption of Restoration as Applied to Margin Claimants and Cash Claimants.*

*Claim of English as to 100 Ray Consolidated Copper—Claim of Knowles as to 1,000 Ray Consolidated Copper.*

On July 15, 1912, in accordance with English's request, Logan & Bryan delivered to Harris certificates for 400 shares of Ray Consolidated, belonging to English, which Harris received on account of Wilson. On October 22, 1912, Wilson purchased through Harris, for account of English, 100 shares of this stock. From time to time between December 12, 1912, and July 28, 1914, Wilson sold through Harris, for account of English, 400 shares of Ray Consolidated. Wil-

son owed cash customers 900 shares of this stock (100 to English and 800 to others), and from the time of the suspension until December 14, 1914, Wilson had on hand with Harris 1,940 shares. On December 14, 1914, Harris sold 1,940 shares of this stock for $30,300.99; i. e., at $15,619 per share. The master found that English had traced his 100 shares of stock, and awarded to him a lien in class A for $1,561.90. This conclusion of the master was based upon the theory that English had a claim superior to those of the margin traders. In other words, as Wilson owed only 900 shares of this stock to cash customers, and had on hand with Harris 1,940 shares, the master has awarded in full to the cash customers, and it would follow from this holding that margin customers, who had traced, under Gorman v. Littlefield and Duel v. Hollins, would receive only their pro rata of the remaining shares. Using, for purposes of illustration, these figures as to Ray Consolidated, and, for the moment, not referring to other features of any particular claim, the effect of the master's holding is that 900 shares are available to cash customers in class A, and the remaining 1,040 shares are to be prorated among those who have traced, but who are not cash customers. The total number of shares held by customers who were "long" of Ray Consolidated at the time of the suspension was 4,140, so that if customer John Doe (for instance) were in this latter class, and traced 100 shares of Ray Consolidated, he would be entitled only to his pro rata of 1,040 shares. In other words, after deducting from the total of 4,140 the 900 full paid, the remainder would be 3,240, and, as John Doe owed 100 shares, his proportionate ownership of the securities thus remaining would be $100/3240$. There would be 1,040 shares left with which to satisfy claims for 3,240 shares; wherefore it would follow, from the master's theory, that John Doe would be entitled to $100/3240$ of 1,040 shares.

This view of the master follows a rather ingenious argument, which carries the theory of presumptive restoration to its ultimate limit. The theory now pressed is that it must be presumed that when the stockbroker, for his own purposes, was converting Ray Consolidated, he converted those shares belonging to margin customers, because he owed the cash customers the highest duty not to deal wrongfully with their securities. The difficulty with this theory, as I see it, is that it confuses tracing with priority. Preliminarily, it may be stated that, where a claimant has traced by certificate number, or, under Gorman v. Littlefield, where there is no other claimant for the same kind of stock, such claimant so tracing is entitled to all of that stock represented either by the identical certificate number or by the same kind of stock "in the box" of the bankrupt, as the case may be. Whether such a claimant shall be then placed in class A or B depends upon the character of the equity of that claimant as developed by the facts.

It thus remains to consider what the relations are between cash customers and margin traders under such circumstances as were passed upon by the master in respect, for instance, of Ray Consolidated. The stockbroker, of course, had no right whatever to hypothecate a security of a cash customer. Under the agreement between the broker and his

margin customers the security of a margin customer could be loaned by the stockbroker or pledged by him for the sum due thereon, or for a greater sum, without further notice to the margin customer. The securities belonging to a margin customer, against whom there was a debit balance, could be and were lawfully hypothecated, and securities of such a margin customer could be taken out of the pledge to enable the broker to lend the "long" margin customer's stock to the "short" customers; but the broker had no right to use the hypothecated securities of the margin customer for his own purposes. If the broker sold any securities in the pledge for his own speculative account, he was guilty of conversion. The testimony in regard to Ray Consolidated is as follows:

"Q. Will you tell us with regard to Ray Consolidated the condition, the net condition, at the date of the failure? A. 1,940 shares.

"By Mr. Gaylord: Q. The longs and shorts, you mean, and between Wilson and his customers, the total? A. There was 4,040 shares held for various clients.

"By Mr. Mitchel: Q. And the total amount of shorts? A. At that time the firm was short 2,100 shares.

"By Mr. Reynolds: Q. No customer was short any shares? A. No.

"By Mr. Remington: Q. The firm was short? A. Yes."

[14] There was a list prepared by Mr. Ogden from the books of Wilson, which showed Ray Consolidated owing to long customers 4,140 and owing by short customers 2,200; but the above-quoted testimony of Gauthier (without reference to additional testimony) is clearly controlling. What this testimony means, therefore, is that prior to the suspension Wilson converted to his own use 2,200 shares of Ray Consolidated out of the 4,140 shares of that stock which he should have had on hand. In other words, it is impossible for any one to say whether, as matter of fact, he converted the shares of cash customers or of margin customers, or, putting the matter another way, it may very well be that he converted securities belonging both to cash customers and to margin customers. At this point it is urged that it must be presumed that he selected the stock of the margin customer for the purpose of converting it, leaving untouched the stock of the cash customer. The difficulty with this theory is that the stockbroker had no more right to convert the stock of a margin customer than he had to convert the stock of a cash customer; for, although the broker had the right to pledge or lend the margin customer's stock under the terms and within the limits of his agreement with the margin customer, he was not thereby authorized to convert it. The conclusion of the special master in this regard can be sustained only by invoking the purest kind of legal fiction, not in my opinion justified by anything said in Gorman v. Littlefield, supra, or Duel v. Hollins, supra, or to be inferred therefrom. The logical procedure, it seems to me, is that the first requirement laid upon a claimant is to trace his stock or its identifiable proceeds. If he fails in that regard, no matter how grievous the wrong, he becomes a general creditor. Without discussing in detail the principles laid down in the Gorman and Duel Cases, supra, the ultimate result is that the claimant must find physically in existence either the precise certificate

or a stock in kind, or the earmarked proceeds where there is a liquidation, as in the case at bar, and, if there are not enough shares to satisfy the particular group of claimants, then such claimants are entitled to their pro rata.

So, in the case at bar, the 20 shares of M. C. Hayes were traced by certificate number. I shall assume, solely for the purpose of this illustration, that no other shares were thus traced by certificate number. There remained, therefore, 1,920 shares. Of this total English traced 100 shares. As above stated, the total number of shares of customers of Wilson who were "long" of Ray Consolidated, at the time of suspension, was 4,140. Deducting from this total the 20 shares of Hayes, the remainder is 4,120. English, therefore, is entitled to $^{100}/_{4120}$ of the 1,920 shares which are left after awarding 20 shares to Hayes, or to 46.602 shares. As Ray Consolidated sold for $15.619 per share, the 46.602 shares of English must be multiplied by $15.619, and the result will represent the lien of English.

Having thus ascertained the proportion of shares to which English is entitled, the next inquiry is as to the class to which his claim belongs. It appearing that English owned his Ray Consolidated outright, his claim falls in class A, for reasons heretofore stated. On the other hand, to make the illustration complete, another claimant, who traced his specific 20 shares of Ray Consolidated, might nevertheless be placed in class B for reasons set forth supra. (See heading "Godwin's Claim.")

[15] The master found that Knowles' 1,000 shares of Ray Consolidated had been converted prior to bankruptcy in an amount sufficient to pay his debt in full. The cost price of Knowles' 1,000 Ray Consolidated was $21,685. The debit balance against Knowles was only $11,108.60. Under my interpretation of Ex parte Bamford and Ex parte Braun, supra, this puts the claim of Knowles in class A. Using the illustrative figures, this would entitle Knowles to $^{1000}/_{4120}$ of 1,920 shares of Ray Consolidated, or 466.02 shares of that stock. Multiplying 466.02 by $15.619 would give the total amount for which Knowles is entitled to a lien. For his balance, Knowles is a general creditor.

[16] Where claimants have failed to prove their claim to a pro rata of Ray Consolidated, such failure cannot enlarge the pro rata of those who have traced. Matter of Pierson, 233 Fed. 519, 147 C. C. A. 405; Id., 238 Fed. 142, 151 C. C. A. 218. In giving the figures above, it will be understood that I am using them only by way of illustration. It is contended, for instance, that Wallace has traced by certificate numbers. It seems to me, on the evidence, that Wallace has traced 200 shares by certificate numbers (Nos. 20,523 and 27,770), but has not traced by certificate number his remaining 300 shares. (It is not clear to me what has been held by the master in this regard. This point may be taken up on the settlement of the order.)

In view of the fact that the conclusions under this heading affect a number of claims, the general principles will be restated, even at the expense of repetition:

[17] Where, *by reason of conversion,* less shares of a certain stock are found "in the box" than are necessary to satisfy the claims of

"long" customers, the procedure is first to trace. If a claimant identifies his stock by certificate number, etc., he is entitled to reclaim that stock or its proceeds. After such specifically identified shares are withdrawn from the total of shares, the remaining claims will be prorated under Duel v. Hollins, supra. After the proper pro rata has been assigned to each claimant who has successfully traced, then the equities of the claimant will be considered, in order to determine whether the claim falls under class A or class B.

[18] I have not discussed any of the contentions revolving around the fact that the stock was in the Harris pledge, and not physically in the Wilson box, because I regard that fact as immaterial for the purposes of the discussion under this head. Further, if there are any cases where there are less shares found than are necessary to satisfy the claims of "long" customers, but where it can be shown that stock has been legitimately used under the terms of the agreement to cover short sales, then, obviously, the situation is different. In such instances, it is a proper and fair presumption that the broker utilized only those securities which he had the right to lend, leaving unaffected the securities paid for by cash customers. I have not attempted to examine the details of each claim, and the proper classification thereof may be taken up upon the settlement of the order.

## Date of Valuation of Securities.

It has happened in this case, and doubtless will in others, that some securities have survived the liquidation. Where the market has arisen, those whose securities were sold suffered accordingly; but that fact should not enable the fund to be increased by the additional present market value of those securities which have not been sold. The contribution which a claimant, whose securities have survived liquidation, is called upon to make, is ordinarily the amount which his securities were worth at the date of bankruptcy. If, for instance, such a security was worth $50 at that date and is now worth $100, the amount in the fund will be $50, and it is due to the unpreventable accidental good fortune of the claimant that he may now have all above the $50. If the security had gone down, the fund would have been better off, and the claimant worse off. In other words, such claimant may pay into the fund the sum of $50 and take his stock, or, failing so to do, the stock may be now sold, and from the proceeds $50 thereof paid into the fund, and the balance paid over to the claimant. This applies in cases like those of Rolph, Conant, and Fiske. Appeal of Mary H. Hudson, supra.

As above stated in this case, owing to the peculiar conditions, the value of the securities should not be taken as of the date of bankruptcy, but must be taken as of the date of the opening of the Stock Exchange, or as soon thereafter as there was a sale of the particular kind of stock in question.

## Particular Claims.

Attention has been called to various instances in which it is contended that there is some error in calculation by the master. I do not

now pass upon these contentions, but refer these details to the master. He can readily determine whether or not these contentions are correct. In passing on the various claims, I have not intended to foreclose such details. It has been my purpose solely to point out the principles governing the classification of the various claims. Except in so far as modified by this opinion, the master has properly dealt with the claims, inter alia, of Duck, Patterson, and Fiske, against which objection has been made.

A word may be added, however, as to the claim of Mrs. Duck. The master properly found that this claimant had traced 20 shares of Mexican Petroleum into the Harris pledge. In addition, on August 1, 1914, she owned 50 shares of Kansas City Southern, but was short 200 Reading. After debiting Mrs. Duck's account with $14,000 for the short sale of Reading, she had a credit balance of $2,071, and was "long" 20 shares of Mexican Petroleum.

[19] If it be assumed that the evidence showed she was a margin trader, and that her long stock and cash were security to the broker for the 200 Reading, nevertheless the situation was that she had a cash balance, and was long her Mexican Petroleum stock. Obviously, that is only another way of saying that she owned the Mexican Petroleum outright, and that her position, in equity, is no different from that of a cash customer who had no marginal transactions. In his finding in this regard the master was right.

## Claims of Various Persons Represented by Mr. Scott, Messrs. Noble, Estabrook & McHarg, and Messrs. McDonnell & Lebett.

[20, 21] The master dismissed various claims, because the claimants had failed to trace their stocks into the Harris pledge, by reason of the fact that no proof was given, other than the testimony of Wilson's accounting, that Harris actually purchased or received their stocks. Whether the master shall take proof in respect of these claims is a matter which rests in the discretion of the court. Under ordinary circumstances a court would be disinclined to give further opportunity to such claimants. I recognize fully the time and labor which have been expended by those who have been active in this proceeding, and they are entitled to that consideration which is usually accorded to the diligent. This case, however, is peculiar. The failing stockbrokers had their main office in California and their branch offices away from New York, and all or many of the claimants represented under this heading (who reside far from New York City) filed their claims and gave their depositions, and it is very natural that they should have assumed that the testimony of Wilson's man, Gauthier, was sufficient. It is not unlikely that in a number of instances that testimony was enough to establish the claim. Indeed, as to Euans and some others (by virtue of the telegram), counsel for Auten et al. concede that such claimants should be placed in class A.

If the determination of this court should be reviewed, however, the appellate court might be of opinion that the claimants should positively follow the claims into the books of Harris. I think it advisable that this should be done in their case for their own protection. In the

circumstances which I have outlined, I am of opinion that it would not be fair, and, indeed, would be harsh, to deny to these claimants this opportunity. These claimants, if so advised, may therefore supplement the existing testimony by testimony as to the Harris books. The least expensive and most expeditious method to that end may be adopted. The expense of stenographer's minutes, if any, for that purpose, and of the accountants, if any, for that purpose, will be specifically charged against these claimants. To the foregoing general disposition there will be a slight exception as to the claim of Quillian. In his case, in addition to the expenses above stated, there will be deducted the expense of the master, if such expense shall be incurred.

### Contribution to Expenses.

The expenses of a proceeding such as this, where the estate is that of a bankrupt stockbroker, may, generally speaking, be divided into three classes: (1) The commissions of the trustee and the allowances to his attorney; (2) the allowance to the master and the disbursements for stenographer's minutes; (3) those expenses which ordinarily a claimant would incur in order to trace his securities.

[22, 23] (1) The commissions of the trustee are, of course, calculated on funds, which do not include either securities or their proceeds, which claimants have successfully reclaimed; nor can any allowance to the attorney for the trustee be made out of such securities or their proceeds.

[24] (2) The allowances to the special master and the expenses for stenographic minutes must come preliminarily out of the general estate. The theory is that the stock of the claimant belongs to him, and under the Pippey Case and In re J. F. Pierson, Jr., & Co. (D. C.) 225 Fed. 889, at page 893 (which merely exemplify a well-known practice), the claimant is entitled to his securities, or their proceeds, without deduction for this class of expenses. It is the duty of the trustee to deliver to a claimant the securities or traced proceeds to which such claimant is entitled, and the trustee, in effect, represents only general creditors.

In the practical administration, however, of estates such as this, it is difficult, and, indeed, hazardous, for the trustee to take upon himself the determination in controverted cases of the title of a claimant, and it is both wise and desirable in such cases, when the trustee is in doubt, that he should require proof to be made. If it should turn out that there are not sufficient funds in the general estate to permit a reasonable allowance to the master and the payment of stenographer's charges, then such balance as is necessary to be paid to the master or the stenographer, or to both, as the case may be, should be equitably apportioned among the successful claimants. The reason for this is that it would not be possible otherwise for the court to determine the rights of the claimants, and the court will protect its own officer in such circumstances. These expenses should first come out of the general estate. If that is not sufficient, then they should come pro rata out of the securities or their proceeds available to class B claimants. If not satisfied out of class B securities or pro-

ceeds, then the balance, if any, for this purpose, should be apportioned pro rata among class A claimants.

[25] (3) It was necessary for the trustee to engage accountants to unravel the details contained in the Harris books. An order has been made apportioning this expense among various claimants including the trustee. (Exhibit B, attached to petition of M. & L. W. Scudder, dated April 14, 1917.) No question has been raised as to the reasonableness of the charges. While it is true that the trustee represented general creditors, and doubtless has done everything in his power in their interest, nevertheless it is also true that the work on these accounts was for the benefit of the claimants, and work which it would have been necessary for them to have done, if this arrangement had not been made. These disbursements, in my opinion, were therefore chargeable to each claimant in the amounts set forth in the petition of M. & L. W. Scudder. In a case such as that of Mrs. Conant, who was able to trace her securities without the aid of the accountants, no charge for that service should be made. I do not understand that what I have set forth supra as to contribution conflicts with the conclusions of the special master set forth at page 114 et seq. of his report; but I have indicated my views because of the fact that some questions in this regard were suggested on the argument. These conclusions of the special master as thus interpreted by me are approved.

In order to avoid misunderstanding, I think it desirable to state that under this heading I am referring only to the case of a bankruptcy of stockbrokers. In the ordinary mercantile bankruptcy, the claimant can point to his specific merchandise, and in such case usually he is entitled to reclaim without contribution of any kind; but a bankruptcy of the character of that at bar must be treated differently because of the practical considerations above referred to. Possibly, when the figures are rearranged, this discussion as to contribution to expenses may prove academic.

### Conclusion.

Except in the respects hereinbefore set forth, and saving corrections in figures which the master may make, and any necessary recasting of accounts, his report is approved.

252 F.—42