## In re H. B. HOLLINS & CO.

### Ex parte NATIONAL BANK FÜR DEUTSCHLAND

(District Court, S. D. New York. April 14, 1915.)

1. SUBROGATION ⨠7—RIGHTS OF SURETY AGAINST PRINCIPAL.

Where the principal debtor gives collaterals to the creditor on the understanding that they shall be used to the extent of any deficiency of the collaterals of the surety, the surety, though making full payment through the creditor's seizure of his collaterals, may not have recourse to the principal's collaterals.

[Ed. Note.—For other cases, see Subrogation, Cent. Dig. §§ 17, 18, 21–29, 58, 77, 83, 92; Dec. Dig. ⨠7.]

2. EXCHANGES ⨠7—PROPERTY IN SEAT—REGULATIONS.

A seat in a Stock Exchange, under the constitution of which all members have recourse to its sale value according to the decisions of the committee on admissions, is a pledge to such members as may be creditors, the terms of which are found in the decision of the committee, and it may insist that members shall exhaust their recourse to all collaterals actually available before any claim on the proceeds of the seat will be allowed.

[Ed. Note.—For other cases, see Exchanges, Cent. Dig. §§ 8–10; Dec. Dig. ⨠7.]

3. MARSHALING ASSETS AND SECURITIES ⨠3—GROUNDS—NATURE OF CLAIMS.

A member of a Stock Exchange, under the constitution of which all members had recourse to the sale value of a seat therein according to decisions of the committee on admissions, was a creditor of a bankrupt member of the exchange, and had as collateral corporate stock which the bankrupt had purchased for another creditor not a member of the exchange. The creditor member sold the stock as collateral for a sum in excess of the debt due. Held, that the creditor member did not have two funds, the collaterals and the seat, to which it had indifferent recourse, and the nonmember creditor as to the corporate stock could only recover the proceeds on the sale of the collaterals which exceeded the amount due the creditor member.

[Ed. Note.—For other cases, see Marshaling Assets and Securities, Cent. Dig. §§ 2, 3; Dec. Dig. ⨠3.]

4. BANKRUPTCY ⨠474—MARSHALING ASSETS—PROCEEDINGS—COSTS.

A proceeding by a creditor of a bankrupt to recover the surplus on a sale of corporate stock held as collateral by another creditor of the bankrupt, and sold for the payment of his claim, and to recover the proceeds of a sale of the bankrupt's Stock Exchange seat, on the theory that it has been subrogated to the claim of the latter creditor thereto, is not a part of the distribution of the bankrupt's estate between creditors, and on the bankrupt assenting to the claim of the petitioning creditor, the petitioning creditor is chargeable with costs, but otherwise no costs will be taxed, and the petitioning creditor is also liable for disbursements

---

⨠For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

occasioned by the contest over the proceeds of the seat, and the bankrupt is liable for so much as were occasioned by the contest over the surplus.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 878–884; Dec. Dig. ⊖474.]

In Bankruptcy. In the matter of Harry B. Hollins & Co., bankrupts. Petition by the National Bank für Deutschland, to impress lien on proceeds of a stock exchange seat. Report of special master, determining the rights of the bank and Nicholas & Co., a creditor of the bankrupt, confirmed.

H. B. Hollins & Co. were bankers and brokers in the city of New York. They were members of the New York Stock Exchange through the ownership of a Stock Exchange seat held in the name of Busch, one of their firm, as board member. H. B. Hollins & Co. subscribed to all the articles of the constitution of the New York Stock Exchange, and held their seat subject thereto and incumbered with numerous conditions when purchased.

A petition in bankruptcy was filed against H. B. Hollins & Co. (and the partners individually) on November 13, 1913. There was no adjudication, a composition having been confirmed without prejudice to pending reclamation proceedings. The Stock Exchange seat in question was sold, and the net proceeds, amounting to $37,616.95, were paid over to the receiver, who holds the same subject to the determination of this court.

The facts are briefly as follows: Prior to the filing of the petition in bankruptcy herein, the National Bank für Deutschland did business with H. B. Hollins & Co. It had two accounts, one account which was conducted here, and the other account which was conducted in Germany. The transactions which are the subject of this proceeding were had in connection with the New York account. The foreign account is only important in this proceeding by reason of the fact that at the time of the filing of the petition in bankruptcy it showed a credit in favor of the National Bank für Deutschland in the sum of $26,490.96, which is applicable against the debit balance in the New York account, as hereinafter shown. On the 7th day of November, 1913, H. B. Hollins & Co. purchased for the National Bank für Deutschland 300 shares of Canadian Pacific stock, and thereafter, for and on account of said purchase, received the following certificates of said Canadian Pacific stock: Certificates Nos. T–133868, T–134315, T–134297, and T–133860, each for 5 shares; Nos. 387693, 388059, 387962, 389404, and 387840, each for 10 shares; Nos. 4983, 4739, and 4505, each for 25 shares; No. 175780, for 54 shares; No. 57647, for 100 shares; and No. 35082 for 1 share. Thereafter and on the 10th day of November, 1913, H. B. Hollins & Co. delivered 250 shares of Canadian Pacific stock, together with other shares of stock, to H. I. Nicholas & Co., a Stock Exchange firm, as security for a loan of $77,360.94 (including interest and other charges) made by said H. I. Nicholas & Co. to said H. B. Hollins & Co. The numbers of the certificates of the said Canadian Pacific stock so delivered are as follows: Certificates Nos. 388059 and 387962, each for 10 shares; Nos. 4983, 4739, and 4505, each for 25 shares; No. 175780 for 54 shares; No. 57647 for 100 shares; No. 35082 for 1 share. These are identified as the property of the claimant. At the time of the filing of the petition in bankruptcy the said H. I. Nicholas & Co. held 350 shares of Canadian Pacific stock, as security for said loan. The additional 100 shares were carried by Hollins & Co. for another customer's account. At the time of the filing of the petition in bankruptcy herein, H. I. Nicholas & Co. as members of the New York Stock Exchange, could have filed a claim with the Committee on Admissions against the seat standing in the name of Britton H. Busch, a member of the firm of H. B. Hollins & Co., arising out of the loan of $77,360.94 theretofore made by said Nicholas & Co. to said H. B. Hollins & Co. as aforesaid. H. I. Nicholas & Co. did not file a claim against the Stock Exchange seat of H. B. Hollins & Co., but sold the securities pledged with them as collateral, including 250 shares of Canadian Pacific stock claimed by the National Bank für Deutsch-

land, thus liquidating their loan in full. The amount realized on said securities was $78,271.13, the amount due on the loan, with interest, at said time, being $77,448.76. Nicholas & Co. thereupon turned over the balance in their hands, to wit, the sum of $822.37, to the receiver herein.

Edwin D. Hays, of New York City, for petitioner.

William C. Armstrong, of New York City, for alleged bankrupts.

LEARNED HAND, District Judge. In subrogation the surety who has paid the debt has only the same rights against the principal, as the creditor himself would have had. If the principal had given collaterals to the creditor, clearly those must be deemed to be specifically so devoted, and the surety may treat them as collaterals in his favor just as the principal might have done. If, on the contrary, the only collaterals are those of the surety himself, then although the creditor has applied these on the debt, the surety must take his place along with the other creditors of the principal, just as the creditor himself would have had to do without the surety's collaterals.

[1] All these statements are obvious and too elementary to need citation. The question at bar is a little different, because here the principal is in the position of one who has given collaterals to the creditor, but upon the understanding that they shall be used to the extent of any deficiency of the surety's collaterals. The result of this arrangement is that the creditor has by hypothesis no recourse whatever to the principal's collaterals until after the surety's have been exhausted. In consequence, if the surety upon making full payment through the creditor's seizure of his own collaterals attempts by right of subrogation in turn to seize the principal's collaterals, he is met at once by the difficulty that it was a condition precedent to the creditor's right of recourse to the principal's collaterals that the surety's collaterals should prove deficient, and that this necessarily precludes the surety from ever standing in the creditor's rights, which he may do only after he has paid the full debt. In other words, the principal has secured the creditor's debt only to the extent of the surety's deficiency, and obviously the surety, who must pay the debt to obtain the right of subrogation, by the very act of payment prevents the occurrence of the condition upon which alone the creditor could have had recourse to the security.

[2] The only questionable thing about this in the case at bar is the assumed analogy between a seat in the Stock Exchange and the pledge of the principal's collaterals against any deficiency in the surety's collaterals. Strictly speaking, the seat is not pledged at all; it becomes a collateral only in the sense that by the constitution of the Stock Exchange all members have recourse to its sale value according to the decisions of the committee on admissions. This is nevertheless in every sense a pledge of the seat to such members as may be creditors, the terms of the pledge to be found only in the decision of the committee so far as they may be legal. What rights have members under the constitution of the Stock Exchange against these proceeds? Their rights, like the owner's pledge to them, are measured by the rules of the Exchange and the decision of the committee. Now it is quite plain that the committee has power, if it will, to insist that the members

exhaust their recourse to all collaterals actually available before the committee must itself recognize any claim upon the proceeds. There is nothing arbitrary or unjust in this, nothing which a court would try to control. It is true that the result may be to turn over to the member or his estate a residue which will be divided among general creditors, but there is no inequity in that, because if the seat be not pledged against the whole debts of members, regardless of their other security, they have no superior equity to general creditors, whose losses are as real as theirs. To succeed, the surety must beg the question by assuming that the seat is pledged generally to all members.

Now it may be that the committee would recognize the rights of members before they had exhausted their collaterals, but, if so, it would be nothing to the point. We are concerned only with the rights of members, and if they could not have compelled the committee to pay them regardless of their other security, no merely voluntary concessions of the committee will avail them. Certainly no one can say that they could have compelled the committee to pay them dividends to the loss of unsecured members, as would have happened in the case at bar.

[3] Therefore, I agree with the learned special master that there were not two funds to which Nicholas & Co. had recourse, and that the rule does not apply which the petitioner invokes.

As to the balance of the sale price of the securities I can see no reason why the petitioner should not have it, and an order will be entered awarding that proportion of the balance, $822.37, which the value of the petitioner's securities as sold bore to the total value of all customer's securities sold by Nicholas & Co.

[4] Respecting costs, I have always regarded these proceedings as inter partes, and not in any sense a part of the distribution of the estate between creditors. Had the alleged bankrupts assented to the petitioner's claim to the balance, I should have charged it with costs. As it is, I shall award no costs. As to disbursements, the petitioner will pay so much as were occasioned by the contest over the proceeds of the Stock Exchange seat, the alleged bankrupts so much as were occasioned by the contest over the balance. The latter is probably too trivial for the trouble of ascertainment; if so, the petitioner will pay all disbursements.

Report confirmed.