## ADJUSTMENT OF THE COMPLICATED ACCOUNTS OF A DECEASED BROKER.

Common Pleas Court of Hamilton County.

THE CITIZENS NATIONAL BANK COMPANY, ADMINISTRATOR OF THE ESTATE OF JOHN M. ANDERSON, DECEASED, v.
FRANK N. ANDREWS ET AL.

Decided, April Term, 1923.

*Stock Bought through a Broker—Becomes Property of the Purchaser at Time of Purchase—Relation of Customer and Broker that of Pledgor and Pledgee—Rights Acquired by Administrator of the Broker—Stocks Pledged with the Broker and Repledged by Him— Rights of Sub-pledgees of Stocks—Each Fund Treated Separately— Customer must Trace his Securities—Right of Broker to Re-pledge Stocks Bought on Margin—Repledging of Stocks Wrongful, when— Customer upon Payment of his Debt to Broker may Recover Stocks up on Margin and not Sold—Claim against Estate of Deceased Broker by his Widow—Class A Claimants and Class B Claimants— Apportionment of Costs and Expenses.*

1. "Where a broker buys stock on the exchange upon the order of a customer, the latter is the owner of the stock from the time of the purchase, whether purchased in his name or not, and he has the right to the possession thereof on demand, subject to the payment to the broker for advances, if any, and commissions, as to which the customer is the debtor of the broker; in other words, the legal relation of the customer and broker is that of pledgor and pledgee." (*Lamprecht* v. *State*, 84 **O. S., 32.**)

2. "Upon such demand, the broker need not deliver the identical stock purchased for the customer, but it is sufficient to deliver the same number of shares of the same kind and value, and a failure to do so on demand may amount to a conversion of the stock and under some circumstances to a fraudulent conversion." (*Lamprecht* v. *State, Ib.*)

3. Upon the death of the broker, his administrator acquires no other or greater interest in such stock purchased for the customer than the broker had. Such administrator is entitled to possession of all the assets of the estate of the broker for the purposes of administration and distribution, but he is entitled to nothing other than assets of the decedent.

4. The administrator's duty is to collect debit balances from the customer. When the customer has paid to the administrator what he

owed the broker at his death, the administrator is no longer concerned with the stock of the customer, and any special property which the broker or the administrator had in the same to secure such indebtedness is entirely extinguished and such customer is entitled to the pledged stock.

5. The administrator is entitled to retain possessioon of securities of customers whose debit balances exceed the value of the securities of such customers on hand; also any securities of customers which are not claimed.

6. If the broker at his death had in his possession (and therefore not repledged) stocks of a customer who was not indebted to the broker, the customer had the right, upon demand, to the immediate possession of such stocks.

7. As to any particular security in the broker's hands at death, if there is sufficient of such to satisfy all claimants to such kind of security, each is entitled to have his own regardless of the matter of identification; or if there are several claimants to a particular kind of security not identified but there is not enough of such particular security in the administrator's hands to satisfy all claimants to such security, then the claimants are to share in the same proportionately. (Liberty Bonds.)

8. Where the broker had re-pledged stocks of customers in his possession with several sub-pledgees, it was the right of the latter to satisfy their claims out of such stocks regardless of the right of the broker as between himself and customers to re-pledge said stocks. After the satisfaction of the sub-pledgees, what remained of such properties in their hands were funds for liquidation and distribution amongst the customers whose stocks or the proceeds thereof were in such fund. Each fund must be treated separately from all others.

9. In order that a particular customer may make any claim to any securities in any such fund or the proceeds thereof, he must trace his securities into such fund. The administrator has no interest in such funds except as to costs and expenses to be hereafter considered, and any surplus after the customers participating therein are satisfied. In no event may a customer recover from any fund or funds more than his full claim.

10. If the securities of a particular customer so re-pledged by the broker were not sold by the sub-pledgee to satisfy its claim, the customer has the same rights to recover such securities as he would have had had the securities not been re-pledged by the broker, and had been found in his possession at death, subject to the obligation of the customer to contribute to the loss.

11. As to the right of the broker to re-pledge stocks of customers the contract, course of business, or customs of the business must be looked to as guides.

12. In the absence of a contract not to re-pledge such stocks, it is generally conceded that where a customer deals with a broker on margin, the latter has the right to re-pledge the stocks purchased for the customer, but a contract not to re-pledge will be enforced.

13. A re-pledge of such stocks is wrongful if the stocks were held by the broker for safe keeping, or if there were no transaction pending between the customer and the broker, or if the stocks were wholly paid for; but a customer may by contract or conduct authorize such re-pledge.

14. It seems that there is no difference as to the right to re-pledge stocks, between those purchased by the broker on margin, and stocks deposited by the customer with the broker as collateral security to customer's trading account. (Noyes case).

15. If the re-pledge of a customer's stock was wrongful he is given a preference, and is entitled to recover his securities or have a lien upon said fund if the securities have been sold, without contribution to the loss. If the fund is insufficient to satisfy all preferred customers (known as Class A customers) there must be contribution amongst them whether their stocks were sold or not.

16. If the re-pledge of such stocks of customers was rightful, such customers (known as Class B customers) are entitled to possession of their stocks found in such particular fund upon paying to the administrator the amount of their debit balances and contributing their proportionate share to the burden of the loan, or loss sustained by reason of the loan.

17. For purposes of liquidation and contribution the securities of the various funds should be valued as of the date of broker's death and interest charged on customers' accounts to that date.

18. The increment of any security follows the security.

19. A broker doing business as an individual in the firm name of A and P authorized certain persons to sign checks on his bank account in such firm name, adding the individual signature of such persons. The bank knew that P was dead, and was informed of the broker's death the day after it occurred. Thereafter checks on said account dated before the broker's death, signed as above stated, but with the abbreviation "Atty." added were presented to the bank, paid by it and charged to the broker's account. *Held*: The authority to pay such checks ceased upon the death of the broker, and the administrator is entitled to recover the sum of the checks so paid from the bank. (Fourth National Bank case.)

20. Where a customer's stock was wrongfully re-pledged by the broker, and sold by the re-pledgee and the proceeds applied to the account of the broker before his death, so that at the time of the death neither the stock nor the proceeds remained in the sub-pledgee's hands, the customer is not entitled to participate in any fund which may be in such sub-pledgee's hands. (Beneker's case.)

21. M was a margin trader with the broker who had purchased a certain stock and re-pledged the same. At the death of the broker there was found among his effects a certain other stock which M had deposited as collateral security to protect the said purchase and which was not re-pledged; the proper margin was maintained at all times. _Held_: M was entitled to recover said stock so deposited upon payment of his debit balance to the administrator without contribution to costs or expenses. (Munson's case.)

22. Where a customer during the life of the broker ordered certain stock which was purchased for him and charged to his account, and the stock retained in the broker's possession, and after the latter's death the customer paid in full for the stock to persons who conducted the said business, and the money paid for the stock was deposited in the account of said brokerage business, which afterwards passed into the hands of the administrator, the customer is entitled to receive the stock from the administrator. (Willsey's case.)

23. Evidence as to the claim by the son of the broker that he is the owner of a certificate of membership in the Cincinnati Stock Exchange considered, and held insufficient to support said claim, and held further that the proceeds of the same are assets of the estate to be paid to the admisistrator.

24. The wife of the deceased broker is a competent witness to testify in support of the claim of her son to said certificate, though she also has an independent claim against the administrator.

25. Husband and wife are competent to testify to acts or communications passing between them, if done or made in the known presence or hearing of a third person competent to be a witness; they may testify to the known presence of such third person.

26. A membership in the New York Stock Exchange although not evidenced by certificate or any document other than a letter from such exchange, is personal property which may be pledged, and a lien thereby created may be foreclosed and the seat sold subject to the constitution of the association. Evidence as to the alleged pledge by the broker to his wife examined and held sufficient to sustain such pledge and lien.

27. Where the widow of the broker asserts against the administrator a claim against said estate and is called as a witness on her own behalf and objection to her competency as a witness is made and sustained, and the administrator then proceeds to "cross-examine" her as to certain details of her claim, such cross-examination is a waiver of her incompetency and she may thereupon testify generally concerning her claim subject to the rule which excludes testimony as to privileged communications between her and her husband.

28. Under General Code 11495, paragraph 1, the claimant of such lien on said seat is competent to testify to facts occurring after the death of the broker.

29. The balance of the proceeds of the New York Stock Exchange seat remaining after discharging the lien of the widow is assets of the estate payable to the administrator, subject to rights of members of the exchange under its constitution.

30. The costs and expenses of this proceeding and other necessary expenses in preparing accounts of customers, in re-stating accounts and in other ways, should be paid according to the following rule: "These expenses should first come out of the general estate. If that is not sufficient then they should come pro rata out of the securities or their proceeds available to class B claimants. If not satisfied out of class B claimants or proceeds, then the balance, if any, for this purpose should be apportioned pro rata among class A claimants.

DARBY, J.

This action was instituted under favor of General Code, Section 10857, asking the direction and judgment of the court as to certain matters arising in the estate of John M. Anderson, deceased..

Anderson died March 13, 1921, and the plaintiff, as a creditor of his estate was appointed administrator. The estate has been represented to the Probate Court as insolvent.

Anderson was a broker, under the name of Anderson & Powell, dealing in bonds and stocks; was a member of the New York Stock Exchange, and, at least until September, 1919, was a member of the Cincinnati Stock Exchange.

The defendants were customers of Anderson in his brokerage business, or claim ownership of, or liens upon, certain property.

A very large part of the property referred to was at the time of Anderson's death re-pledged to Hornblower & Weeks, the correspondent of Anderson in New York, through whom his transactions were conducted on the New York Stock Exchange.

When the suit was filed, the residue of the Hornblower & Weeks fund was in the hands of Hornblower & Weeks; by a stipulation amongst the parties concerned, that fund has been brought to this jurisdiction, deposited with the custodian appointed by the Court, and all questions relating to the same submitted to the court in this action. The other re-pledges of Anderson were to local banks and individuals as security for Anderson's call loans.

Quite appropriately, the action as it now stands has been designated an "omnibus" suit.

The business of Anderson was conducted in the ordinary manner in which such concerns are carried on, and the securities involved were to a great extent those purchased on margin by Anderson for his customers.

It will tend to clarify the discussion of this case if the exact relations subsistng between Anderson and his customers under these circumstances are clearly set forth.

## RELATION OF ANDERSON TO CUSTOMERS.

In *Lamprecht* v. *State*, 84 O. S., 32, which was a prosecution for embezzlement growing out of stock transactions, the court say:

"Where a broker buys stock on the Exchange upon the order of a customer, the latter is the owner of the stock from the time of the purchase, whether purchased in his name or not, and he has the right to the possession thereof on demand, subject to payment to the broker for advances, if any, and commissions as to which the customer is the debtor of the broker; in other words, the legal relation of the customer and broker is that of pledgor and pledgee. Upon such demand the broker need not deliver the identical stock purchased for the customer, but it is sufficient to deliver the same number of shares of the same kind and value, and a failure to do so on demand may amount to a

conversion of the stock, and under some circumstances to a fraudulent conversion."

See also, pp. 39-42.

In *Richardson, Trustee,* v. *Shaw,* 209 U. S., 365, it is held:

"While a broker who carries stocks for a customer on margin may not be strictly a pledgee at common law, he is essentially a pledgee and not the owner of stock. *Markham* v. *Jaudon,* 41 N. Y., 235 approved.

"Neither the right of the broker to repledge stock carried on margin for a customer, nor his right to sell such stock for his protection when the margin is exhausted, alters the relation of the parties, is inconsistent with the customer's ownership, or converts the broker into the owner of the stock."

A multitude of other authorities might be referred to in support of the foregoing principle, and indeed, except for the decisions in Massachusetts there seems to be a general agreement among the courts as above indicated.

Special attention however is called to the case of *Skiff* v. *Stoddard,* 63 Ct., 198, p. 224, where the court say:

"We are of the opinion that both reason and authority support the proposition that the relation of pledgor and pledgee existed between the plaintiffs (claimants) and Bunnell and Scranton (brokers) at the time of the latter's insolvency as respects the stocks and securities which they were then carrying for the former in the execution of their orders.

"From this proposition it follows that the plaintiffs as pledgors of the stocks and securities so carried, are entitled to redeem them. The assignment of Bunnell and Scranton does not interfere with the exercise of this right. The title to the pledged property was never in the insolvents. The plaintiffs have from the first been its general owners. The insolvent firm had only a special property in it. The assignment and appointment of the defendant as trustee in insolvency have never operated to deprive the plaintiffs of their ownership, nor to convert Bunnell and Scranton's interest into an absolute title in the trustee. The defendant trustee is not in the position of a bona fide purchaser for value. The creditors of the insolvents did not, prior to the assignment, have the right to appropriate the plaintiff's stocks and securities to the satisfaction of their claims. The transfer of the stocks into the name of Bunnell and Scranton upon the

books of the several corporations did not confer such right. *Mowry* v. *Hawkins*, 57 Ct., 453.

"The trustee in his capacity as a representative of the creditors can not therefore have acquired it. By the plaintiffs' exercise of their privilege of redeeming the property, the creditors of the pledgees are not deprived of any right or advantage they ever enjoyed. Redemption involves payment of the plaintiffs' several indebtednesses. From these payments the creditors obtain every benefit it was ever theirs to hope for."

As to the duty of a trustee in bankruptcy concerning bonds which were wrongfully pledged and which have been recovered and identified, see *In re Amy, et al*, 263 F. R. 8, 10.

Neither the trustee in bankruptcy nor the administrator of a decedent's estate acquires any greater property or interest in the pledged property than the bankrupt or deceased had in the same.

The incident of bankruptcy or death of the broker does not alter in any degree the legal rights or interests which the customer has in his pledged property.

Most of the authorities, if not all, referred to in this action, have to do with the bankrupts' or insolvents' estates, but the principles involved in those cases are the same in general as should be applied in this case.

The administrator is entitled to possession, for the purposes of administration and distribution, of all of the assets of the estate of Anderson, but he is entitled to nothing more for the purposes of administration than the assets.

In this case the court appointed the bank which was also appointed as administrator, as the custodian of the fund known as the Hornblower & Weeks fund. There had been filed in the city of New York, by certain customers of Anderson, suits in which said customers sought to reclaim their securities in said fund which had survived the sell-out to liquidate the Hornblower & Weeks account.

The administrator claims that the whole of said Hornblower & Weeks fund should be paid to it as administrator, whereas the customers themselves claim that the administrator has no interest in such securities except as a pledge, and that all he is

entitled to recover in any event is the amount of indebtedness of the customers.

It is true as claimed by the administrator, that in bankruptcy proceedings the bankruptcy courts have assumed jurisdiction and determined the rights of the parties in the matter of reclamation proceedings. But it does not appear in any of those cases that any question was raised as to the jurisdiction of the court or the propriety of the court making such orders. In many of them it appears that the securities were found in the hands of the trustee and in others that the court ordered them paid to the receiver or trustee, but this seems to have been done without objection.

There is no good reason to justify the confusion or commingling of the securities of the customers with the assets of the decedent.

The court is of the opinion generally speaking, that the only interest in such pledged property which the administrator has, is to collect the debit balances due from customers, and when the customer has paid the administrator what he owed Anderson at his death, the administrator is no longer concerned with the securities of the customer, and any special property which Anderson or the administrator had in the same to secure such indebtedness is entirely extinguished.

As the court views the case, the administrator is also entitled to retain possession of the securities of customers whose balances exceed the value of the securities on hand.

In *In re Carrothers,* 182 Fed., 501, it is held:

"7. Where stock brokers in bankruptcy had certain securities in possession of their New York correspondents belonging to customers who were indebted to the bankrupts in excess of the value of the securities bought for them, and the account against such customers was uncollectible, the loss sustained by such bad account being one that would fall on the general creditors, and not on those holding other securities in the hands of such New York correspondents, the general creditors should have a pro rata share in the New York account in proportion to such bad accounts."

The administrator is also entitled to any securities of customers which are, not claimed:

In *In re Pierson et al*, 238 Fed., 142, the court say:

"That the shares of those who claim should be increased by the circumstance that other long customers made no claim, would be inequitable. What would otherwise have gone to those customers should go to the general creditors."

Before leaving the subject of the claim of the administrator that the Hornblower & Weeks fund should be turned over to it, it is proper to call attention to the fact that it frequently happens that a decedent has in his possession, property which is left there by the owners for safe keeping, or which the decedent held in pledge, and the proper way is for the owner to make claim and proof of his property, and in case of a pledge to pay the balance due to the administrator, when the property is returned to the owner.

It was said in the case of *In re McIntyre* (Pippey's Appeal), 181 Fed., 955, at p. 959:

"If he (Pippey) had been left undisturbed to prosecute the replevin suit, he would have recovered the specific piece of property which he owned, had identified, and was entitled to."

What has been said with reference to the so-called Hornblower & Weeks fund as to the rights of the administrator, should apply equally to the other loan funds, and in case the administrator has come into possession from any of Anderson's pledgees, of the property of Anderson's customers, it should be treated in the same manner.

Since the administrator and custodian is one and the same corporation, represented by one and the same counsel, there can be no confusion of account, or difficulty of settlement with any of the customers.

### The Several Funds in General.

At the time of Anderson's death, as stated, there had been repledged customers' securities with Hornblower & Weeks in New York. certain banks and individuals in Cincinnati, for An-

derson's loans.. The pledgees satisfied their claims out of such securities, as they undoubtedly had a right to do, whether as between Anderson and his customers the re-pledge was wrongful or rightful, and after such liquidation there remained stocks or cash, or both, in the hands of such pledgees.

As to each of these loans, therefore, certain particular securities of customers were re-pledged. Their property, after liquidation by the sub-pledgee, remained in its hands, and it follows that each separate fund should be considered and treated separate from all others. *In re Jamison* (C.C.A.), 209 Fed., 541; *In re Wilson*, 252 Fed., 631, 642; *Skiff* v. *Stoddard*, 63 Ct., 198, 227.

It is clear, therefore, in order that any particular customer of Anderson may make any claim to any of the securities in any particular fund, or the proceeds thereof, he must trace his securities into such particular fund. In other words, a customer whose securities were re-pledged with Boye, would have no right or claim in the Fourth National Bank fund, because of his securities in the Boye pledge. So far as the administrator is concerned (excepting from the present consideration the matter of costs and expenses and any surplus which may remain after satisfying claimants), when there is paid, to it the debit balance owing by a particular customer, the administrator has no further interest in any of the securities of such customer, whether they be in one or more of such funds, but the customer should not in any event recover more than his full claim.

## CUSTOMERS' SECURITIES NOT RE-PLEDGED.

Certain stocks and bonds belonging to, and identified by customers, were in Anderson's possession at his death, and therefore were not re-pledged. These are now in the hands of the administrator. If the owner of such stocks and bonds were not indebted to Anderson at the time of his death, and he was not carrying any trades for him, such owner was entitled to the immediate possession of such property upon demand.

If such claimants were indebted to Anderson as of the date of his death, they were entitled to the possession of such property upon the payment of their debt to him. (Munson case).

The debit balances were due Anderson at his death, and therefore are assets of his estate, and payable to the administrator.

As to any particular security in Anderson's hands at death, if there is sufficient of such to satisfy all claimants to such kind of security, each is entitled to have his own, regardless of the matter of identification; or if there are several claimants to a particular kind of security not identified, but there is not enough of such particular security in the administrator's hands to satisfy all claimants to such security, then the claimants are to share in the same proportionately. (Liberty bonds.)

*Duel* v. *Hollins*, 241 U. S., 523.

What has been said as to securities in the hands of the administrator not re-pledged, applies equally to the securities remaining in the hands of Anderson's sub-pledgees after liquidation.

Any customer whose securities were not in Anderson's hands at his death, or were not re-pledged by him in any of the funds referred to, can not have a claim against such securities or funds.

THE STATUS OF CLAIMANTS TO PROCEEDS OF FUNDS.

The rights of claimants may be said to depend in the first place upon the question as to whether the re-pledge of the securities by Anderson was wrongful or rightful.

If the re-pledge was wrongful, in that Anderson at the time and under the course of dealings between him and his customer, had not right to re-pledge such securities, the customer is placed in what is known as Class A, and is entitled to recover his security, or have a lien upon the fund if his securities have been sold.

Claimants placed in Class A have superior equities, and therefore may recover their securities without contribution, except possibly for expenses. If the fund is insufficient to satisfy all Class A customers, there must be contribution amongst them, whether their stock was sold or not. *In re Wilson* (Rolph's claim), 262 Fed., 631.

As to the right to re-pledge, the contract, course of business, or custom of the business must be looked to as a guide. If the securities re-pledged were wholly paid for, there was no right to re-pledge.

If the securities were held for safe-keeping, there was no right to re-pledge. If the customer was not indebted to the broker the same is true. If no transaction existed between the broker and the customer at the time of the re-pledge, the latter was equally wrongful.

It is generally conceded that where a customer deals with a broker on margin, the broker has the right to re-pledge the customer's stocks purchased for him, to secure his own loans in order to carry on his business. This right is frequently expressed in the contract, but if not expressed, it is generally implied as a necessity of the business.

The right of the broker to re-pledge securities which are pledged with him as collateral security to the account, and not as margins, will be considered later. Those customers therefore who were dealing upon margins, or who had authorized the use of their collateral stocks, are to be placed in Class B, their equities being inferior to those of the Class A customers.

Leaving out of consideration again for the time the question of costs and expenses, it seems clear that the Class B customers are entitled to possession of their stocks upon paying to the administrator the amount of their debit balance to Anderson's estate, and contributing to the burden of the loan or loss their proportionate share.

For the purpose of liquidation and contribution, the securities in the various funds should be valued as of March 13, 1921, the date of Anderson's death, and interest on the various accounts should be charged to that date. The increment should follow the security.

## INDIVIDUAL CLAIMS.

The court has not undertaken to do more than state general rules and principles which should be a guide as to the questions raised upon the pleadings. Arguments have been general as to the claims of the administrator on the one hand and the various defendants on the other. Only in cases in which customers have filed briefs claiming certain particular rights will the court go outside of the statement of general principles.

## NOYES' CLAIM.

Briefly stated, the claim of Noyes is that at the time of the death of Anderson, the latter was carrying for Noyes, stocks upon margin, and ·that said Noyes had indorsed in blank and delivered to decedent as collateral security for the full performance of any obligations growing out of such transaction, certain other securities.

Noyes claims that as to the collateral security the decedent had no right to re-pledge, although it is conceded that as to the stocks carried on margin there was such right. He therefore claims that as to the collateral security so re-pledged that he is entitled to the benefit of a prior lien, though as to the stock carried on margin, which was not wrongfully re-pledged, he stands as a Class B customer.

The claim of the administrator on the other hand is, that there is no difference as between the two classes of securities where the trader is a margin customer, and indebted to the broker.

Upon the hearing the court reached the conclusion under the circumstances as stated, that the re-pledge of Noyes' collateral stock was not authorized, and that to the extent that the pledge of his stock was not authorized he was entitled to a preference. In reaching this conclusion and in the original opinion, reference is made to the following cases: *Thomas* v. *Taggart,* 209 U. S., 385; *Skiff* v. *Stoddard,* 63 Conn., 198-200 (second from last syllabi); *In re McIntyre,* (Pippey's case), 181 Fed., 955; *In re Ennis* (Bamford's Appeal), 187 Fed., 720; *In re Toole* (Petition and Appeal of Foster), 274 Fed. 337 (special attention being directed to the dissenting opinion of Manton, Circuit Judge); 35 Harvard Law Review, 486; *Furber* v. *Dane,* 203 Mass., 108, 115; *In re Wilson,* 252 Fed. 631, 636 (Rolph's claim); *Richardson* v. *Shaw,* 209 U. S., 365-374.

The original opinion of the court was based upon the distinction between stocks deposited with Anderson as margin, and those deposited as collateral security for future dealings.

A re-hearing of Noyes' claim was had upon application of certain of the creditors, and it was then conceded by counsel for Noyes, that the pledge of this collateral stock was not wrongful— whether that be by reason of the contract or custom does not

appear; but the claim is that as between the creditors of Anderson whose stock was pledged with Hornblower & Weeks, that Noyes is still entitled to preference.

Upon re-consideration and upon the assumed right of Anderson to re-pledge Noyes' collateral stocks, it is held that there is no difference between the claims of persons whose re-pledges were rightful, based upon a supposed and possibly real distinction between margin stocks and collateral stocks.

### Fourth National Bank Claim.

For several years prior to his death, Anderson did business as Anderson & Powell, with the Fourth National Bank. He carried a general deposit account there. Powell, formerly associated with Anderson in business, was dead, as was well known to the bank. The usual card indicating authorized signatures for said checking account bears date November 8, 1917. The authorized signatures are as follows: "Anderson & Powell, J. M. Anderson; Anderson & Powell, Wm. S. Hill; Anderson & Powell, John M. Anderson, Jr."

Anderson died March 13, 1921, of which occurrence the bank was informed March 14th. Thereafter checks bearing date prior to Anderson's death were paid by the bank from the account of Anderson & Powell. These checks were signed either "Anderson & Powell, By John M. Anderson, Jr., Atty.," or "Anderson & Powell by W. S. Hill, Atty."; the words "Anderson & Powell By" were printed on the checks, but the individual name was written.

It is claimed by the administrator that these checks were paid without right or authority; that as Anderson was dead, any authority of the bank to pay checks upon said account had ceased with his death.

The bank on the other hand claims that the facts above set out and admitted, justified it in the belief that there was a partnership actually existing between the signers of said signature card, and that it was authorized to pay said checks.

The bank knew that Anderson and Powell were dead. It was authorized to pay checks upon authorized signatures; the signatures to these checks were not authorized. If there were a part-

nership it was unusual and unnecessary that a partner should sign the checks as attorney or employee.

These facts, if they do not actually contradict the theory of a partnership, at least put the bank upon inquiry, which would have revealed that there was no partnership, and that the signers of these checks were just what they represented themselves to be by their signatures, to-wit, agents or employees of a deceased broker!

The authority to pay such checks ceased upon the death of Anderson.

*Covert* v. *Rhodes*, 48 O. S., 66, on p. 72 the Court say:

"There is little if any conflict of authority upon the proposition that on notice of the drawer's death before acceptance by the bank, its right to pay the bill or check ceases, and its indebtedness to the drawer becomes assets of his estate."

There being no proof of a partnership, or evidence to justify the bank in believing that a partnership existed after the death of Anderson, the case of *Enck* v. *Gerding*, 67 O. S., 245, relied upon by the bank can have no application.

The conclusion of the court is, that the administrator is entitled to recover from the Fourth National Bank the sum of the checks so paid after Anderson's death.

### BENEKER'S CLAIM.

A brief was filed on behalf of Henry W. Beneker; his claim is, that at the time of Anderson's death, and for some days prior thereto, Beneker had a credit balance of $570 in his trading account with Anderson. He had paid in full to Anderson for certain stock purchased in March, 1921, which however, was re-pledged by Anderson with Hornblower & Weeks. The re-pledge of his stocks was wrongful, and as to them there is an unquestionable right to reclaim, or in the alternative, a lien on the fund.

Beneker claims, in addition, that he should also be placed in Class A as to other stocks which Anderson had purchased for him in December, 1920, and which had been re-pledged to Hornblower & Weeks and sold by the latter for Anderson's ac-

count in December, 1920.  He claims that the repledge of the last mentioned stocks was wrongful because they were held by Anderson as collateral security.

The right to reclaim or to share in the proceeds of any fund depends upon the customer tracing his securities into that particular fund.  If the securities or the proceeds were in the fund at the time of Anderson's death, there would seem to be no question but that the customer in such case would be entitled to share in the fund.  But if, prior to the death, the securities had been wrongfully converted by Anderson; or if there was a wrongful re-pledge, and the securities sold by the re-pledge for Anderson's account, there is no right to a lien upon the fund as to those securities, because in fact at the time of the death, neither they nor the proceeds were in the fund.

The fact that a customer has been defrauded, or has a large equity generally, will not entitle him to a lien upon the fund of which his securities were not a part.

Again, if a customer was a debtor to the broker, and the latter by fraud converted sufficient of the property of the customer to wipe out his debit balance and thus make him a creditor, he would have a right to claim as a Class A customer as to his securities traced into the fund in question, and remaining there at Anderson's death..

This is what the court understands to be the meaning of the cases:—*In re Wilson* (Godwin's claim), 252 Fed., 642; *Ex parte Ennis* (Bamford's claim), 187 Fed., 721, 724.

The reasoning of the court in the Wilson case, supra (Rosenthal's claim, 640) seems to be in accord with the foregoing statement.

The court is therefore of the opinion that as to the stocks of Beneker, he is entitled to a lien upon the fund only in case he is able to trace said stocks or their proceeds into the hands of Hornblower & Weeks, and find them there after the death of Anderson; otherwise any customer whose securities were at any time wrongfully re-pledged would be a Class A customer, no matter what use the re-pledgee may have made of the securities, or how long before death or bankruptcy they may have been disposed of by the latter.

## MUNSON'S CLAIM.

Munson had been a margin trader with Anderson, but his trades had all been closed except one, which was the purchase of one hundred shares of Steel Common, bought upon margin. The steel stock was re-pledged to Hornblower & Weeks, and was sold by it after Anderson's death, in the liquidation of its claim.

There was found in Anderson's box after his death, forty-five shares in the aggregate, of the capital stock of the Bibb National Bank of Macon, Georgia, which the evidence tends to show was pledged by Munson as collateral security to protect this purchase of Steel Common. The required margin was at all times maintained.

There is really no dispute as to Munson's right to reclaim and re-possess this Bibb stock; the only dispute is as to the terms upon which that shall be done. Under the general principles as hereinbefore established, Munson must pay his debit balance, and the court has already ruled that he must pay this debit balance to the administrator, who takes the claim just as Anderson left it.

The administrator, however, claims that Munson is required to contribute to the costs and expenses before he is entitled to his stock. In fact, the stock is now in the hands of Munson, having been recovered in a suit in replevin, and upon the giving of a re-delivery bond.

The administrator claims that Munson should be charged the costs of his proceeding in the Probate Court to recover possession of the stock; also the cost of his action in replevin; also a proportionate part of the costs of this proceeding, and of the expense to which the administrator has been put in getting up the accounts for Anderson's customers.

Munson was not a party to the actions brought in New York hereinbefore referred to. The law is well settled as to his right to reclaim his stock upon payment of his indebtedness. The administrator refused to acknowledge his right, and seemingly, solely upon the claim that Munson should contribute to costs and expenses, did the administrator base his action.

If one is entitled to the possession of property, and is forced to resort to law to gain possession of it, he should not thereby

be charged with the costs. While the administrator should exercise every diligence to protect its decedent's estate, it is not authorized in arbitrarily failing to recognize legal rights and interests of pledgors of stock or property, and upon a proper claim and tender of the payment of the amount due, there is no question as to the administrator's duty. All that was necessary was for the administrator to present its claim and demand payment. The books of Anderson were open to determine the amount of indebtedness of Munson, and there seems to be no question but that a legal tender was made to the administrator. So far as this Bibb stock is concerned, Munson was in no way involved in the Hornblower & Weeks fund, except in knowing the amount for which his Steel Common stock was sold, and deducting that from the amount of his indebtedness to reach the net debit balance. .

That Munson had a right to replevin, see *In re McIntyre* (Pippey's appeal), 181 Fed., 955, p. 959.

In the opinion of the court, Munson is entitled to recover his stock without costs, and without any contribution for expenses.

### GIERINGER BROTHERS (WILLSEY) CLAIM.

On March 8, 1921, Willsey, through Gieringer, gave an order to Anderson for the purchase of five shares of Willys-Overland stock, which order was filled by the purchase of said stock on that day, and the account of Gieringer charged with the purchase price, $38.50.

After Anderson's death, to-wit, on March 22, 1921, upon the bill for said purchase being received, the said sum was paid at the office formerly conducted by Anderson and Powell, to Hill and Anderson. A receipt was given with the indorsement: "Stock to be delivered upon receipt from New York" and the cash deposited in the Fourth National Bank to the credit of the Anderson and Powell account. Subsequently the stock was delivered to the administrator, who still holds it. Willsey asks for the delivery of the stock.

Under the authorities herein referred to, upon the purchase of the stock for Willsey, the latter became the owner of the stock and Anderson but a pledgee.

Upon payment of the amount due to Anderson, Willsey

would have been entitled to immediate delivery of the stock. Upon payment of the amount due the estate, Willsey is entitled to his stock.

The bank deposit into which this payment found its way is in the hands of the administrator, though it got there through the agency of unauthorized persons. This being the fact, it would seem that Willsey is entitled to receive his stock, and the court so advises the administrator.

### CINCINNATI STOCK EXCHANGE MEMBERSHIP.

The administrator has possession of a certificate of membership in the Cincinnati Stock Exchange, in the name of John M. Anderson, Jr., who claims the membership. This certificate was found in the box of Anderson and Powell, to which J. M. Anderson, J. M. Anderson, Jr., and W. S. Hill had access. The envelope containing it was inscribed with the following words: "Stock Exchange Membership, John M. Anderson, Jr." In the same box was also contained personal property of Mrs. John M. Anderson and others, which was returned to them by the administrator. The certificate is in the following words:

"Organized 1885.            Incorporated 1887

### THE CINCINNATI STOCK EXCHANGE
#### No. 100.
### CERTIFICATE OF MEMBERSHIP.

This certifies that John M. Anderson, Jr., is a member of the Cincinnati Stock Exchange in good standing at the date hereof.

The membership hereby represented is subject to the rules governing the said Association and, if not impaired, or forfeited under the provisions of the Rules and Regulations, is transferable upon the books of the Association to any person elected by the Board of Officers, upon the assignment and surrender of this certificate in form as provided on the reverse hereof, and upon payment of all indebtedness to the Association and an initiation fee provided by the Rules and Regulations.

                  Witness the signatures of its President
(seal)         and Secretary at Cincinnati, Ohio, this twenty-third day of September, 1919.

                      W. E. Hutton, President,
                      H. M. Beazell, Secretary.

*Reverse side.*

For value received I hereby assign to .......................

all my rights to the within Certificate and the Membership represented by the same.

Cincinnati, Ohio, .....................

John M. Anderson Jr.

Witness ......................"

The testimony offered relating to the certificate and its so-called transfer to Anderson, Jr. was given by Mrs. Mary P. Anderson, who was the wife of the deceased.

A preliminary question arose as to her competency as a witness, to prove statements made by the decedent to John M. Anderson, Jr. in her presence. It was claimed that Mrs. Anderson was a party to the action, and was therefore incompetent.

While it is true that Mrs. Anderson is a party in the sense that she has a separate claim against the estate,, yet as to said claim of Anderson, Jr., she was not a party, and was competent to testify concerning his claim, as any other witness, and as though she had no claim of her own.

The suggestion that Mrs. Anderson was incompetent to testify because the statements were in the nature of privileged communications is equally untenable, for the reason that by her testimony it clearly appears that the statements concerning which she testified were made in the known presence and hearing of a third person, to-wit, John M. Anderson, Jr.

Husband or wife called to testify to an act or communication is competent to testify to the known presence of a third person. *McCague* v. *Miller*, 36 O. S., 595.

Husband or wife may testify notwithstanding death of said third person before trial. *Sessions* v. *Trevitt*, 39 O. S., 259.

The court is therefore of the opinion that Mrs. Anderson was a competent witness to testify to the statements made by the decedent concerning the membership referred to.

Mrs. Anderson's testimony in substance was that upon the return of Anderson, Jr., from the World War, September, 1919, the decedent said to him that—

"he could have his choice of returning to college or going into the brokerage business with him, as an employee. He said to my son in my presence that if he went into the brokerage business he would turn over to him his seat on the Cincinnati Stock Exchange—certificate for the seat."

That later the decedent stated to Mrs. Anderson in the presence of Anderson, Jr.:

"I have turned over my seat on the Cincinnati Stock Exchange to Mitchell; he is now a full-fledged broker."

When the certificate was found in the box of Anderson and Powell, it was indorsed in blank. The reason for the same, as appears by the profert of counsel for Anderson, Jr. on page 56 of the record is as follows:

"That as soon as he (Anderson, Jr.) received the certificate from his father, he indorsed it in blank, and that the reason for so doing arose from a custom of all brokers to indorse such securities as came into their hands at once, so that they may become liquid and easily accessible for sale or borrowing for use as collateral in the owner's absence as well as in his presence to attend to personally."

Thus it appears that the certificate so made out in the name of Anderson Jr., (which has been called a transfer to him) was indorsed by him in blank for the uses of Anderson and Powell. It must be remembered that Anderson, Jr. was in the employ of Anderson and Powell, and was not otherwise connected with the business, as owner, or in any other capacity.

Evidence was also offered tending to show that subsequent to the issuing of the certificate to Anderson, Jr., that Anderson and Powell advertised that it was a member of the Cincinnati Stock Exchange; letterheads and statements in use at and prior to the death of Anderson were offered in evidence containing the advertisement to that effect. The membership was shown to be valuable, and its value was fixed at something like $3,000. The advertisement of membershop in the stock exchange was for the benefit of the business of Anderson and Powell. No evidence was offered on behalf of Anderson, Jr., tending to show that he ever paid the annual dues to this stock exchange.

Evidence was offered on behalf of the administrator, of the account books of Anderson and Powell, which tended to show that the Cincinnati Stock Exchange membership was carried as an asset of Anderson and Powell, after the certificate was issued to Anderson, Jr.; and certain entries indicating that the dues were

paid to the stock exchange by Anderson and Powell, and not charged to any account of Anderson, Jr.

Objection was made to this evidence, upon the ground that it was in the nature of self-serving declarations, and that declarations of Anderson in the books oof Anderson and Powell after the transfer of said membership, were incompetent as evidence against Anderson, Jr.

While it may be accepted as a general rule that declarations by a vendor or transferor concerning his ownership of property sold or transferred, after he has parted with the ownership are generally not admissible, yet the question in this case was as to whether or not Anderson had transferred the beneficial ownership in said membership to his son.

As reflecting upon the nature of the actual transaction between the deceased and his son, are the facts already referred to; i. e. the indorsement in blank, the finding of the certificate in the box of Anderson and Powell indorsed for the uses and benefit of Anderson and Powell, the advertisement that Anderson and Powell was a member of the Stock Exchange, and the failure of any proof on the part of Anderson, Jr., that he had paid any of the dues to the Stock Exchange.

While the testimony of Mrs. Anderson was that the decedent had "turned over" to his son said certificate, and that the letter was now a "full-fledged broker," this language is not of so clear a character as to indicate that there had been a transfer of the beneficial interest, especially in view of the use which Anderson, Jr. afterwards made of the certificate, and the other evidence referred to.

The Court is therefore of the opinion that the evidence offered on behalf of the administrator as to the items in the book was relevant, as showing the actual character of the transaction between the deceased and his son.

The son testified that he knew that there was an account in the books entitled "Cincinnati Stock Exchange" when he came into the office, and he claimed to have no further acquaintance with the books after that time.

The evidence is that the books contain an entry under the heading "Cincinnati Stock Exchange Seat, January 1, 1920" (several months after the so-called transfer of this seat to Anderson, Jr.) reading, "Balance" "$4,000..00," under head of

"Deposits." The books also show, running through the period from September, 1919 to January 3, 1921 under the same head, expense charges for the Stock Exchange dues, in but one case of which there is a reference to "J. M. A. Jr."

The entries in the books were made before any question or controversy arose as to the ownership of the membership.

The value and benefit to a broker of such a membership is shown in *Anderson* v. *Durr, infra.*

The evidence, other than that relating to the books, supports an inference that there was no intention to transfer the beneficial interest to Anderson, Jr. That being the case the rule of exclusion invoked by counsel for Anderson, Jr. should not apply and the court holds it does not apply. If the controversy were between the father and son over this seat, there could be no question that the father could testify as to the character of the transaction, though it contradicted the effect of the writing, and he could offer corroborative evidence of his testimony to show that it was not his intention and was not the understanding of the parties that the beneficial interest be transferred.

The court is unable to see any reason why, the father being deceased, the same character of evidence should not be received on behalf of the administrator.

The evidence further is that Anderson, Jr. transacted the business for Anderson and Powell on the stock exchange, and it was presumed that he knew the rules, and that he was bound to pay dues. His failure to offer evidence that he paid dues is at least an admission that they were paid by somebody else, who was his employer, and there is no evidence that there was any objection to this at any time.

The court is therefor of the opinion that the proceeds of the sale of the Cincinnati Stock Exchange seat should be paid to the administrator.

## MRS. ANDERSON'S CLAIM.

There was offered in evidence a document admitted to be in the handwriting of the decedent, of which the following is a copy:

"Jan. 1st 1919.

"In consideration of Mary P. Anderson having loaned me as

capital for Anderson & Powell twenty-five thousand $25,000.00 U. S. Liberty 3 1-2 per cent bonds. I hereby pledge to her for the repayment of this loan my membership in the New York Stock Exchange to that amount.

John M. Anderson.''

Mrs. Anderson was called as a witness in support of her own claim based on said writing; upon objection it was held that she was not a competent witness to testify in her own behalf, and after testifying to some other matters which are not involved in this question, the attempted examination in chief was concluded. Thereupon, counsel for the administrator asked her certain questions relative to her claim, and bearing upon its validity. Against the objection of her counsel, she was permitted to testify that she had not notified the New York Stock Exchange, nor any of the parties to this suit, that she had such a lien.

After this cross-examination, her counsel asked the privilege of interrogating her further concerning her claim, and the court, reserving decision for further consideration, permitted her to testify, and she did testify that she had loaned her husband bonds, and that he had delivered to her the paper spoken of as the lien in this case.

It was claimed that as she was an incompetent witness, that the cross-examination referred to did not justify further examination concerning her claim.

It is conceded that as an interested party she was generally incompetent under Section 11495 G. C. If she had not been cross-examined there would have been no opportunity to interrogate her as to her claim, but counsel for the administrator chose to cross-examine her, as they had a right to do under Sec. 11497 G. C.:

''At the instance of the adverse party, a party may be examined as if under cross-examination, either orally or by deposition, like any other witness.   *   *   *

This section and the other sections bearing upon the competency of witnesses and parties to testify, were under consideration in *Roberts* v. *Briscoe,* 44 O. S., 596, and in discussing the object of the section referred to, the court say, on p. 602:

''The interest of an estate may urgently require that an exec-

utor or administrator should waive what belongs to him as a privilege, and call the opposite party as a witness. The facts upon which he founds his defense, or upon which he bases his claim may be locked up in the breast of the adverse party, and without his testimony a failure of justice may ensue. The legislature could not have designed to place the estates of deceased persons at such disadvantage by depriving them of evidence within reach, necessary to their protection against imposition and fraud. The adverse and surviving party, when compelled to testify by the executor or administrator, can not reasonably complain; for, though a party, he can then be examiined fully in his own behalf on the subject of his examination in chief. *Niccolls* v. *Esterly*, 16 Kan., 32; *Wharton on Evidence*, Sec. 475A.''

The defendant in a criminal case, who produces his wife as a witness in his favor (she not being ordinarily a compellable witness against him) waives the question of the incompetency of the witness, and she may then be cross-examiined the same as any other witness; except as to confidential communications.

*Haberty* v. *State*, 8 C. C., 262. Motion for leave to file petition in error in Supreme Court refused. See also: *Niccolls* v. *Esterly*, 16 Kan., 32, opinion by Brewer, J.; *Plowman* v. *Nicholson*, 81 Kan., 210.

Under these authorities there can be no question but that the cross-examination of Mrs. Anderson by the administrator constituted a waiver of her incompetency, and she was then competent to testify as any other witness, limited of course by the rule that acts and communications between husband and wife are absolutely barred unless made in the known presence or hearing of a third person competent to be a witness.

*Dick* v. *Hyer*, 94 O. S., 351; *Dischner* v. *Dischner*, Court of Appeals, first circuit; *Haberty* v. *State*, *supra*.

It does not appear that the act and communication testified to by Mrs. Anderson, which took place between her and her husband, occurred in the known presence or hearing of a third person competent to be a witness; therefore her testimony as to those facts was inadmissible, and is now excluded from consideration.

The document does not constitute a ''communication'' within the meaning of the section. See *Holtz* v. *Dick*, 42 O. S., 23, 26.

Another question relating to the testimony of Mrs. Anderson was as to her possession after the death of her husband, of the document above described, which she testified she took from a safe in her possession after his death, and gave to her counsel. This last testimony is competent from two viewpoints—first, it was made relevant by the cross-examination on behalf of the administrator; second, it related to facts occurring after the death of the decedent, and is therefore admissible under G. C. Section. 11495, paragraph 1.

Her possession of this document after the death of her husband gave rise to two presumptions, one, that she was the owner of the document, and the other that the specified loan of bonds had not been repaid.

The evidence in the case further is, that the books of Anderson and Powell contain no entry of this transaction. Further, there was evidence by Mrs. Anderson that in the settlement of an estate she had received some of the bonds, and there was no attempt to contradict or deny this statement; so that there was evidence that she had the bonds, and the document being in the handwriting of the decedent speaks for itself.

It is claimed, however, that no notice of the alleged lien was given to the New York Stock Exchange, nor to any other persons, and the same is therefore invalid. The court is of the opinion that notice is not necessary, and that the rules relating to recording do not apply to liens of this character. See *Jones on Collateral Securities,* Sec. 6, and note, and Sec. 136.

It is further claimed that the New York Stock Exchange seat is not subject of pledge.

The nature and character of this identical seat is fully discussed in *Anderson* v. *Durr, Auditor,* 100 O. S., 251, pp. 257 to 260. A certificate of such membership is not issued as in the case of the Cincinnati Stock Exchange, but the New York Stock Exchange by letter notifies the member of his admission.

It has been held that a membership of this character may be pledged and a lien thereby created may be foreclosed, and the seat sold, subject to the constitution of the association. *Clute* v. *Loveland,* 68 Cal., 254, 261; *Nashua Savings Bank* v. *Abbott,* 181 Mass., 531, 535; *Ketchum* v. *Provost,* 141 N. Y., Sup., 437; *O'Dell* v. *Boyden,* 80 C. C. A., 397, 403; 150 F., 731.

The Court is of the opinion that said pledge constituted a valid lien against the proceeds of the New York Stock Exchange seat.

RESIDUE OF PROCEEDS, NEW YORK STOCK EXCHANGE SEAT.

At the time of Anderson's death, there were in the hands of Hornblower & Weeks, securities of great value of the customers of Anderson. Acting under Article 28 of the Constitution of the exchange, Hornblower & Weeks liquidated its claim by selling certain of said securities and leaving on hand a very large sum in securities and cash.

The so-called "seat" of Anderson on the New York Stock Exchange was very valuable. It has already been held that Mrs. Anderson, wife of the broker, has a valid lien upon said "seat," to secure the repayment to her of $25,000 loaned by her to her husband. The residue of the proceeds of this "seat" are involved and to be disposed of.

The administrator claims the proceeds as part of the general estate, for administration and distribution to general creditors under the laws of Ohio.

The customers of Anderson whose securities were repledged by Anderson to Hornblower & Weeks claim this fund upon the equitable ground that Hornblower & Weeks should have exhausted its claim against said "seat" prior to the sale of their securities so pledged; or, that since Hornblower & Weeks has satisfied its claim out of the securities of the customers re-pledged by Anderson, that the said customers should be subrogated to the rights of Hornblower & Weeks to the proceeds of said "seat."

Article 15 of the Constitution of the Exchange provides for the disposition of the proceeds of the "seat," upon transfer of membership, voluntarily or by death, and provides that, subject to the payment of claims of the stock exchange, claims of members arising upon contracts shall be paid if allowed by the committee on admissions of the exchange, and the balance goes to the member or his personal representative.

It is the claim of the customers whose stock was re-pledged to Hornblower and Weeks, that regardless of the funds and securities available to Hornblower & Weeks, they should first have

sought satisfaction by the sale of the "seat" referred to, and that if that were not sufficient (as of course it was not), it might then resort to securities in its hands by way of pledge, to fully satisfy its claim.

It will be presumed that all persons dealt with Anderson as a broker (and otherwise), on the strength of the character he had in part at least as a member of the New York Stock Exchange. All his customers, as well as other creditors were affected by such standing.

Should this valuable asset of his estate be now made available to certain of his customers, i. e., those whose securities happened to be re-pledged to Hornblower and Weeks, to the exclusion of others whose securities happened to be pledged to other persons (but who otherwise stand in substantially the same position), and to the exclusion of his general creditors?

As between two creditors, one of whom has liens upon two funds, and the other of whom has a lien upon but one of said funds, the general right to require the creditor who has the two securities to proceed first against the fund upon which the other creditor has no lien, is recognized; but in the only cases to which attention has been called in which the exact situation presented here was considered, the courts held that the equitable ground here invoked does not apply, and that the correct interpretation of the articles of the New York Stock Exchange is that the "seat" is only available to a member in case of insufficiency of securities or contracts to satisfy the claim of said member. *In re Van Schaick and Company* (Appeal of Lyon), 228 Fed., 465; *In re H. B. Hollins and Company* (Ex parte Bank), 225 Fed., 618.

In the first of said cases all the claims urged on behalf of the customers were urged and overruled, and this court is asked to disregard the authority of thoses cases and apply to this situation the equitable ground above referred to.

It would seem that to so hold would conflict with the authorities holding that a lien may le established upon such "seat."

It must always be kept in mind that the right to create such a lien is subject to the constitution of the exchange, but if, in any event, a stock exchange creditor of a member may take the proceeds of the "seat," the lien would be of no value.

While it is true, as said in the cases above referred to, some hardships may result from the construction placed upon the constitution of the exchange, this court feels bound to follow the adjudications upon the subject, and therefore holds that the residue of the proceeds of the New York Stock Exchange seat, after discharging the lien of Mrs. Anderson, are payable to the administrator.

### COSTS AND EXPENSES.

The administration costs and expenses, including attorneys' fees, and administrator's fees for extraordinary services, are within the jurisdiction of the Probate Court.

Costs and expenses have been incurred in the cases in New York, in this action in preparing accounts of customers, in restating accounts and in other ways. By whom should these costs and expenses be paid?

The concluding remark of Mayer, J., in the *Wilson case,* Ib, p. 657, seems to be very pertinent at this time:

"Possibly when the figures are rearranged, this discussion as to contribution to expenses may prove academic."

This statement follows his opinion given on p. 656 as follows:

"These expenses should first come out of the general estate. If that is not sufficient, then they should come pro-rata out of the securities or their proceeds available to Class B claimants. If not satisfied out of Class B securities or proceeds, then the balance, if any, for this purpose, should be apportioned pro-rata among Class A claimants."

That this rule is just is clear from the considerations that it is the decedent's estate that is under course of administration— that by reason of his acts great losses will result to his customers; that what the latter are seeking is to recover what is their own; that no act of theirs brought about the condition of the estate, and that they as owners of specific pledged property are not injuring general creditors in any way by attempting to get their own property.

The court is not satisfied that the actions in New York were wrongful. Surely if the customers had the right to replevin

(McIntyre, 181 F., 959), they had the right to proceed by other appropriate remedies to recover their property.

There will have to be some adjustment of the costs of those cases, and the court will protect its own appointee (the custodian), in the performance of any duty imposed upon it, but the accounts are not in, and until they are, the court will not undertake to make any order as to the items of costs properly cognizable in this cause, except that the custodian, after delivering to those Class A customers *all of whose securities were wrongfully re-pledged,* such securities or the proceeds thereof, shall retain in his hands ten per cent of all the balance of said fund, pro-rated amongst the remaining claimants, until a final and proper order may be made as to costs and expenses, "when the figures are re-arranged."

The administrator shall also be subject to the same direction respecting securities in his hands which are claimed and identified by customers as their securities.

### HILL AND ANDERSON.

After the death of John M. Anderson, William S. Hill and John M. Anderson, Jr., continued, for a period of some two weeks, to conduct the business of Anderson and Powell, at its former place of business. Quite naturally, many complications exist by reason of their transactions. Except as to one or two matters, however, no briefs or arguments have been made touching upon these transactions, and as to the particular one of them, there is so great a conflict in statement, that the court is unable to determine what the facts are in order to reach a judgment.

It has been suggested that a master should be appointed to examine into these various claims and report to the court concerning them, in order that the rights of the parties may be adjusted.

Of course under the existing circumstances the death of Anderson put an end to any authority of Hill and Anderson, Jr.; but it may be their transactions are so separated from the estate of the decedent as they may not necessarily be confused. This would seem to involve matters of bookkeeping, and facts which have not been presented to the court.

As to whether there should be a master appointed for the purpose suggested, counsel may give their advice to the court.

### CONCLUSION.

In the multitude of propositions arising on the pleadings, arguments and briefs, it is quite certain that some questions in the case have not been considered, or not fully discussed in this opinion. Counsel may direct the court's attention to any such, and consideration will be given to them.

As to the matters which are discussed herein at length, it may be accepted that they are the court's best judgment, reached after mature and painstaking consideration, and that so far as this court is concerned, they may be accepted as final. Other public business would not justify the court in giving further time for the consideration of those questions.

The administrator suggests the appointment of an auditor to adjust the accounts in conformity to the judgment of the court. This seems to be a proper suggestion, and should be complied with. When the judgment entry is presented to the court, the name of the auditor will be supplied.

The court does not deem it necessary, but can see no objection to a finding in the judgment entry, that Anderson's customers are general creditors to the extent that they may be required to contribute to the loss resulting from Anderson's transactions.

In preparing the judgment entry counsel are directed to include a general order continuing for further consideration any matters not considered nor disposed of, in order that a continuing jurisdiction may be had, and that a new action would not be necessary in case further direction or judgment should be desired.

*Murray Seasongood, Robert P. Goldman, Charles H. Stephens, Jr.,* counsel for plaintiff.

*Pogue, Hoffheimer & Pogue, Ernst, Cassatt & Cottle, Dolle, Taylor, O'Donnell & Geisler, L. A. Ireton, Oscar W. Kuhn, Waite, Schindel & Bayless, Frost & Jacobs, Hunt, Bennett & Utter, Mallon & Vordenberg, Harmon, Colston, Goldsmith & Hoadly, C. B. Wilby, et al,* counsel for defendants.